961 P.2d 1051

**The STATE of Arizona, Appellee,**

v.

**Carl WHALEN, Appellant.**

**No. 2 CA–CR 96–0766.**

Court of Appeals of Arizona,
Division 2, Department A.

Dec. 24, 1997.

Review Denied Sept. 10, 1998.

*v. Super. Ct.,* 130 Ariz. 189, 192, 635 P.2d 174, 177 (1981).

Grant Woods, the Attorney General by Paul J. McMurdie and Eric J. Olsson, Tucson, for Appellee.

David T. Hardy and John M. Sando, Tucson, for Appellant.

## OPINION

BRAMMER, Judge.

Following a jury trial, appellant Carl Whalen was convicted of one count of attempted participation in a criminal syndicate and eight counts of fraudulent scheme or practice. A.R.S. §§ 13–2308, 13–2311. Whalen raises a number of issues on appeal. He contends that the trial court erred by: (1) denying him the right of self-representation; (2) appointing defense counsel to represent him against his will, who then advanced a defense he neither approved nor authorized; (3) failing to direct a verdict in his favor as to all charges based upon insufficient evidence; and (4) failing to enter a judgment of acquittal or to grant a new trial on the fraudulent scheme charges because insufficient evidence was produced that he had the required fraudulent mental state. Whalen also raises a claim of ineffective assistance of counsel. We affirm.

### Facts and Procedural History

We view the record in the light most favorable to sustaining the verdicts and resolve all inferences against appellant. *State*

v. *Atwood,* 171 Ariz. 576, 832 P.2d 593 (1992). In April 1995, Whalen was stopped by a Tucson police officer for failure to display a license plate. When asked for his driver's license, insurance, and registration, Whalen informed the officer that he did not possess any of the requested documents because he was "a citizen of the Republic of Arizona." The officer then issued citations for failure to display a license plate, expired registration, no proof of insurance, failure to transfer title, no valid driver's license, and driving on a suspended or canceled driver's license. In February 1996, Whalen was tried in absentia and found guilty in municipal court on all counts.

Before the trial date, Whalen and two other individuals began mailing letters to the officer who cited Whalen, the Tucson police chief, and other public officials including three city court magistrates who presided over various aspects of Whalen's case. In these mailings, Whalen claimed that the recipients had violated his constitutional rights. He also threatened to impose liens against them and demanded payments ranging from $25,000 to $1,000,000 in silver. Included in the first mailing were unsigned lien forms and unsigned admissions that the recipients had violated Whalen's rights. A second mailing contained notices of default and lien forms with the recipients' names printed on them. Whalen then published notice of the liens in a local newspaper. He also recorded numerous liens against the recipients which bore their forged signatures and which were embossed with a crimped seal bearing the logo "County of Arizona." The police chief also received a letter from Whalen stating that "the promissory notes and the name of indemnity bonds will automatically delete" if the chief stopped infringing his rights and promised that "future trespass will not occur."

Whalen and his two accomplices were subsequently arrested, charged and convicted.[1] Each moved to represent himself in propria persona. The court found that all three defendants had knowingly and intelligently

---

1. The defendants were initially indicted on charges of participation in a criminal syndicate, as well as eight counts of fraudulent scheme or practice. Near the end of trial, the state amended the first count to attempted participation in a criminal syndicate.

waived the right to counsel and redesignated the defendants' appointed attorneys to "advisory counsel" status. After Whalen indicated that he refused to accept advisory counsel, advisory counsel moved to withdraw. This motion was denied.

Before trial, Whalen and his codefendants filed numerous motions, claiming that the court lacked jurisdiction over them.[2] During pretrial hearings, the court explained to the defendants that jurisdiction had been established, instructing them that if they did not appear for trial, they would be tried in absentia. On the first day of trial, the defendants again objected to the court's jurisdiction and refused to cross the bar into the front of the courtroom, explaining it was their belief that doing so would waive jurisdictional objections. The court informed them they would not be allowed to conduct their respective defenses unless and until they agreed to do so from the front of the courtroom. After again refusing to cross the bar, the court stated that the defendants had "voluntarily absented themselves" from the proceeding.

The court then advised the defendants that because they were not in custody, they had the right to "leave the courtroom if [they] wished] to and not participate in any fashion even as a spectator," adding that it was in their interests to participate in the trial and encouraging them to do so. The court again informed the defendants that jurisdiction had been established and that stepping in front or staying behind the bar would not affect that determination.

The court then ordered advisory counsel to represent the defendants as they "would have had the defendants simply absented themselves physically," whereupon counsel expressed their concerns about representing the defendants because the defendants did not wish them to do so. Counsel also asserted that caselaw suggested that the defendants had the right to put on their defenses as they saw fit, even if that meant remaining

mute throughout the proceedings. The court responded that the defendants "have not even been willing to minimally follow the rules, and the rules require that they come forward, sit at the table, and at that point they could then choose to be mute throughout the entire trial." Meanwhile, Whalen left the courtroom. He subsequently appeared in court sporadically throughout trial.

### Right to Self–Representation

■■■■ Whalen first contends that the trial court's refusal to permit him to conduct his own defense constitutes reversible error. He asserts that he desired to conduct his defense but that he wanted to do so "not from counsel table, but from a position about three feet away," because he believed, as he told the court, that by sitting at the defense table he would waive jurisdictional objections. A defendant in a state criminal trial has a constitutional right to proceed without counsel when the defendant knowingly, intelligently, and voluntarily elects to do so, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. De Nistor*, 143 Ariz. 407, 694 P.2d 237 (1985); *State v. Martin*, 102 Ariz. 142, 426 P.2d 639 (1967), but only so long as the defendant "is able and willing to abide by the rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S.Ct. 944, 948, 79 L.Ed.2d 122, 130 (1984).

Assuming arguendo that Whalen intended to defend himself, we find no error in the trial court's refusal to allow him to represent himself unless and until he was willing to do so from the front of the courtroom. Whalen argues that there is a narrow class of behavior, not encompassing his, which can justify termination of the right of self-representation. He contends the trial court may do so only when a defendant "deliberately engages in serious and obstructionist misconduct," relying on *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46, and that an examination of the few Arizona cases invoking this exception illustrates its

**2.** The defendants argued, inter alia, that the court flag, which presumably bore a gold fringe, "establishes the jurisdiction of the Admiralty, maritime or administrative jurisdiction," and that "[u]ntil and unless this court joins with the

Accused by taking down the fringed or braided gold on the flag in this court and replace it with the American Flag of Peace ... We the Accused, deny this court jurisdiction."

narrow character, citing *Martin*, 102 Ariz. at 146, 426 P.2d at 643 (the defendant displayed utter and complete disregard for court, made repeated verbal outbursts, consistently disregarded the trial judge's warnings, and performed "wild antics," justifying the trial judge to refuse defendant's request to waive counsel).[3]

We do not find that the court's ability to terminate a defendant's right to self-representation is as circumscribed as appellant claims. Initially, we find very little instructive caselaw pertaining to the pro se defendant's refusal to follow court-imposed protocol. The United States Supreme Court, federal courts, and state courts, including Arizona's, have not yet determined specific standards by which a trial court may deny or revoke a defendant's right of self-representation based upon in-court behavior.[4] Although, as Whalen contends, *Faretta*, in a footnote, mentions, without elaboration, that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct," 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46, it does not suggest that this is the only type of behavior that may warrant such a revocation.[5] Similarly, neither *Martin*, nor the other Arizona cases upholding denial or termination of the right of self-representation because of in-court misconduct, have suggested that it is only defendants engaged in

such behavior who may waive the right to proceed pro se.

*Martin* holds that it is within the trial court's discretion to deny a defendant the right to continue his own defense if he acts in such a manner as to seriously disrupt the proceedings, either by refusing to exercise the decorum necessary to ensuring an orderly proceeding or by denying the court due respect, citing *United States v. Private Brands, Inc.*, 250 F.2d 554 (2nd Cir.1957). *Martin* upheld the trial court's denial of defendant's request to waive counsel, even though the court had not told the defendant it refused his request because of his ongoing in-court misconduct. In situations such as in *Martin*, the defendant's actions often make an orderly proceeding impossible and, as is often the case, the obstreperous behavior is for this very purpose. Thus, the necessity of denying or withdrawing the right of self-representation is often clear.

Here, although Whalen refused to cross the bar into the front of the courtroom, we cannot say whether he intended to disrupt the trial process, or whether he was aware that his unwillingness to go beyond the spectator section could result in such disruption. Thus, we believe it was incumbent upon the trial court to provide Whalen with timely notice that his behavior could result in the revocation of his right to proceed pro se. *See State v. Rickman*, 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986) (courts should "indulge

---

3. Also citing *State v. Bush*, 109 Ariz. 487, 489, 512 P.2d 1221, 1223 (1973) (advisory counsel ordered to represent defendant after he stormed out of the courtroom and announced he would "resist being brought back to court any way he could"), and *State v. Van Bogart*, 85 Ariz. 63, 331 P.2d 597 (1958) (pro se defendant gagged after making repeated verbal outbursts during voir dire).

4. The Supreme Court cases and federal case cited by Whalen, *Faretta*, *Wiggins*, and *U.S. v. Flewitt*, 874 F.2d 669 (9th Cir.1989), involve the denial or revocation of the right to proceed pro se based upon various aspects of defendants' competency to represent themselves, and not upon their refusals to follow court imposed rules. Consequently, the courts' treatment of the latter issue is understandably cursory. In fact, *Faretta*'s treatment of this issue is contained in a single footnote and, as the Court notes, only refers to deliberately disruptive behavior.

5. Indeed, *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the case cited in *Faretta* and which contains the "serious and obstructionist misconduct" language, actually refers to the type of behavior warranting the removal of a defendant from the courtroom, not the type of behavior warranting the revocation of a pro se defendant's right to self-representation.

As the court in *Faretta* notes, if the defendant's behavior is so disruptive that he should not remain in the courtroom, his right of self-representation may also cease. Conversely, however, the Court gave no indication in *Faretta*, nor in subsequent decisions, that the defendant's right of self-representation could not be terminated unless and until his behavior became so disruptive that the trial court would be justified in having him physically removed.

every reasonable presumption" against the waiver of the constitutionally protected right of self-representation). Because we find that: (1) it was within the trial court's discretion to require Whalen to conduct his defense from the front of the courtroom, and (2) the court provided Whalen with clear, unambiguous, and timely warnings that he would lose the right to represent himself unless he was willing to follow this order, we conclude that the trial court did not err by revoking Whalen's right of self-representation.

#### a. Refusal to Cross Bar

■ Within the broad spectrum of court-imposed rules pertaining to protocol, we can identify two distinct categories. The first relates to propriety-based concerns involving the traditions and dignity of the court. The second deals more with practical concerns related to ensuring an efficient and orderly proceeding. Many rules of protocol implicate both concerns. As *Martin* recognizes, unruly behavior on the part of the pro se defendant not only abuses the dignity of the court, but often obstructs the court process as well.[6]

Whalen asserts that he was at no time unruly in court. He also argues that "[t]here is nothing fundamental about the furnishings of the courtroom, or the precise seat taken by the defendant," and no statute or rule requires a courtroom to have a bar, noting that its presence is a purely traditional holdover from medieval days at the inns of court in England.[7] Hence, Whalen contends, the court's revocation of his right to proceed pro se was improper because his desire to sit on one side of the bar rather than the other would neither be an affront to the dignity of the court nor would it have any practical consequences with respect to the trial process.

Without deciding whether the traditional codes of decorum honored in the courtroom are less worthy of enforcement than other propriety-based or the procedurally-based rules, we do not believe that Whalen's refusal to cross the bar to be as inconsequential as he suggests. Rather, his unwillingness to venture into the front of the courtroom would likely have significantly disrupted the trial, having a negative impact upon both the dignity of the court and the court's ability to conduct the proceeding in an efficient and orderly manner.[8]

Fundamental to the court's ability to control the courtroom, is the power to instruct those participating in and observing trials as to the manner in which they comport themselves. To further this end, trial judges have the authority and the obligation to ensure that counsel, litigants, jurors, court personnel and spectators behave civilly. For the same reason, they are also necessarily endowed with the authority to instruct the various parties where they may and may not proceed in carrying out their respective roles.[9] The pro se defendant is not exempt from these requirements. *See State v. Harding,* 137 Ariz. 278, 670 P.2d 383 (1983) (pro se defendant did not have a constitutional right, attendant upon his right to self-representation, to walk about courtroom during trial so as to compel finding that his being shackled violated such right). We hold that Whalen was

---

6. In contrast, a defendant's insistence upon wearing what the court considers to be inappropriate attire would normally implicate solely the former interest, while the pro se defendant's negligent failure to appear for court on time more strongly implicates the latter.

7. Appellant explains that students would fashion a line of tavern benches into a "bar" upon which participating "counsel" would sit during moot court competitions, citing Bryce Lyon, *A Constitutional and Legal History of Medieval England* 627 (1980).

8. As one example, appellant would have been unable to reach the bench when the court or counsel requested a sidebar conference out of the hearing of the jury, a frequent occurrence. In this situation, we see no alternative but to have the judge, court clerk, prosecutor, advisory counsel, and court reporter travel, en masse, to his seat in order to do so.

9. We note that trials are not static affairs; rather, counsel, witnesses, and evidentiary materials are in frequent motion within the courtroom. Consequently, the typical courtroom's configuration, wherein the spectator section is provided for persons who *observe* a trial and the other side of the bar is reserved for those who want to *participate* in a trial, is mandated not so much by tradition but because of the practicalities of conducting courtroom proceedings.

obligated to cross the bar if he wanted to represent himself.

### b. Sufficiency of Notice

■ On the day originally scheduled for trial, the court explained to Whalen and his codefendants:

> If it is your intent to represent yourselves you will have to step in front of the bar. If you are not going to represent yourselves then I will have advisory counsel take over this morning. I need to know what your intent is. You are not going to be allowed to make any opening statements, question witnesses, make closing remarks or conduct cross-examination if you are going to sit in the back of the courtroom.

The defendants responded that the court did not have jurisdiction over them, and each refused to cross the bar into the front of the courtroom. The court found "the Defendants, by sitting in the back of the courtroom, and by their statements here in open Court, are literally voluntarily absenting themselves from th[e] proceeding." The court continued the trial for one week so that advisory counsel could prepare, instructing counsel, "I will expect advisory counsel ready to proceed if, once again, the Court finds the Defendants have voluntarily absented themselves."

On the first day of trial, Whalen and his codefendants sat together in the courtroom's spectator section. The court asked each defendant if he was willing "to step in front of the bar, come forward to the desk where your advisory counsel is now sitting," informing the defendants that, as it had previously indicated, they could represent themselves only if they were "in the front of the courtroom in front of the bar." Each defendant was then asked if he was "willing to come in front of the bar." Once again, each defendant declined on "jurisdictional grounds." At this point, the court stated that although the defendants were seated in the back of the courtroom, they had "voluntarily absented themselves" from the proceeding and ordered advisory counsel to represent the defendants.

Based upon these facts, we find it clear that Whalen was provided with sufficient notice that he was required to conduct his defense from the front of the courtroom and that he would forfeit his right to represent himself unless he was willing to do so. Moreover, the court gave Whalen two opportunities, with a week's reflection period in between, to change his mind. He ultimately chose not to follow the court's clear and unambiguous directive. Accordingly, we concur with the trial court's finding that Whalen waived his right of self-representation, and that he did so knowingly, intelligently, and voluntarily. *See Faretta; De Nistor.*

### Appointment of Defense Counsel

Whalen next contends that the trial court erred by terminating his right to conduct his own defense, and then ordering advisory counsel to conduct the trial in his stead. Whalen initially argues that he was denied effective assistance of counsel because counsel "first learned he *might* be trying the case a week before trial, and first learned he *would* be trying the case just before jury arguments." Whalen further argues that the defense conducted by counsel was simply not "*his* defense" as he had not retained defense counsel, had not agreed to be bound by counsel's decisions, and did not wish counsel to speak on his behalf. (Emphasis in original.) He asserts that "whether the resulting defense ... was good or bad is irrelevant."

### a. Unauthorized Defense

■ Addressing the latter issue first, we note that this is not a circumstance in which the court "chose" defense counsel over the defendant, rather it appointed counsel by default after finding that Whalen had "voluntarily absented" himself from court. *Compare State v. Binder,* 170 Ariz. 519, 520, 826 P.2d 816, 817 (App.1992) (trial court abused its discretion by denying defendant the right to represent himself because of its belief that the defendant did not possess the requisite "technical legal knowledge" to adequately do so). Indeed, the court had already determined that Whalen was qualified to represent himself. Moreover, as the court stated, he merely had to sit "mute" at the defense

table in order to retain his right to continue conducting his defense. Because Whalen refused to follow this minimal requirement, the court deemed him "absent" with respect to his self-representation, and, after Whalen's departure upon hearing this determination, he was then "absent" physically as well. Faced with this dilemma, we believe that the trial court did not err in directing advisory counsel to proceed in Whalen's absence. *State v. Delvecchio*, 110 Ariz. 396, 519 P.2d 1137 (1974) (no error in allowing appointed advisory counsel to take over case of defendants, who were representing themselves, when they were excluded or voluntarily absent from courtroom); *State v. Bush*, 109 Ariz. 487, 512 P.2d 1221 (1973) (trial court did not abuse its discretion in appointing defense counsel to represent defendant against his wishes after he fired advisory counsel and walked out of courtroom).

Because we find that the court did not err by terminating Whalen's right to self-representation and appointing advisory counsel to conduct his defense, we need not address Whalen's claim that these acts violated his due process rights.

**b. Ineffective Assistance of Counsel**

■ We do not review an ineffective assistance of counsel claim on direct appeal unless "we may clearly determine from the record that the ineffective assistance claim is meritless." *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989); *see also* Ariz.R.Crim.P. 32, 17 A.R.S. Because we find Whalen's claim to be clearly meritless, we will address it here.

■ To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient, and there was a reasonable probability that counsel's deficient performance prejudiced the defendant. *State v. Rosas*, 183 Ariz. 421, 904 P.2d 1245 (App.1995). The defendant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different and that they had an actual adverse

effect on the defense; it is not enough to show that the counsel's errors had some conceivable effect on the outcome of the proceeding. *State v. Meeker*, 143 Ariz. 256, 693 P.2d 911 (1984). If an ineffective assistance of counsel claim can be rejected for lack of prejudice, we need not inquire into counsel's performance. *Atwood*.

Whalen makes no claim that he would have been acquitted were it not for counsel's representation. As stated above, Whalen's primary contention with respect to counsel's representation was that it was not his own; thus, regardless of whether defense counsel's tactical decisions were "good or bad," they were appellant's to make. Whalen does complain that counsel called no witnesses on his behalf; however, he fails to suggest what witnesses, if any, could or should have been called, what their testimony would have been, and how such testimony would have benefitted his defense.

■ Although, as Whalen points out, it was not certain that court-appointed counsel would be required to conduct the defense until the day of trial, trial counsel was aware of Whalen's jurisdictional objections and the court's position that the trial would proceed regardless of Whalen's presence or absence at least two months previously. On the day originally set for trial, the court found Whalen absent, warning defense counsel that he would conduct the defense unless Whalen agreed to come to the front of the courtroom. Furthermore, although defense counsel questioned whether he should represent Whalen against his wishes on the day of trial, counsel at no time said he was unprepared to proceed. Moreover, overwhelming evidence was presented at trial inculpating Whalen. Appellant has failed to demonstrate that he was prejudiced by counsel's representation.

**Insufficiency of Evidence and Failure to Prove Mental State**

■ Whalen next contends that the trial court erred by failing to grant judgments of acquittal on all the charges.[10] Because de-

10. Although Whalen argues that "the indictment[s] should have been dismissed" pursuant to Rule 20, Ariz.R.Crim.P., 17 A.R.S., we interpret

Whalen's claim to be that the trial court improperly failed to "enter a judgment of acquittal of

fense counsel did not contest the sufficiency of the evidence on this issue as required pursuant to Rule 20, Ariz.R.Crim.P., 17 A.R.S., we find that this issue is waived. *State v. Montoya,* 125 Ariz. 155, 608 P.2d 92 (App.1980) (motions for directed verdict not made before the jury's verdict is returned are waived). However, to the extent this argument is based upon a claim of insufficient evidence to sustain the verdicts, we will address it below.

■ Whalen also asserts that the trial court erred by denying his post-trial motion for a new trial pursuant to Rule 24.1, Ariz. R.Crim.P., on the fraudulent scheme or practice charges because the state failed to prove that he "knowingly" falsified documents or used the documents while "knowing" that they contained falsehoods as required by A.R.S. § 13–2311. He argues that the only evidence of his motivation in mailing the documents consisted of a book, entitled *Lien Process from A to Z,* which was found during a search of his house. The book apparently instructs the reader to follow the course Whalen undertook when the reader believes his "rights" have been violated. Because the book did not instruct the reader that its processes were improper or involved fraudulent acts, Whalen claims there was no evidence presented at trial that he knowingly falsified the documents. He further asserts that because he openly mailed the documents to the affected parties, including law enforcement officers, prosecutors, and magistrates, and published notices of his actions in the newspaper, the only state of mind that could be inferred was that he "honestly believed his actions were lawful." We disagree.

■ Evidence is sufficient to support a verdict if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *State v. Routhier,* 137 Ariz. 90, 669 P.2d 68 (1983). There was sufficient evidence from which the jury could find that appellant knowingly engaged in a fraudulent course of conduct, even if done openly. Indeed, contrary to Whalen's contention that the only evidence pertaining to his state of mind was the "lien" manual, the

one or more offenses charged in an indictment"

state presented an abundance of evidence, including documents bearing appellant's signature, describing an ongoing eight-victim harassment operation conducted by Whalen and his codefendants. The state also presented evidence that Whalen forged the victims' signatures and used an unofficial seal. From this evidence, a rational jury could have concluded that Whalen possessed the required mental state to commit fraud. *See State v. Quatsling,* 24 Ariz.App. 105, 108, 536 P.2d 226, 229 (1975) ("[I]ntent may be inferred from all the facts and circumstances disclosed by the evidence ... and need not be established by direct proof.").

We also find this evidence sufficient for a rational jury to find Whalen guilty on all counts charged. *See Atwood,* 171 Ariz. at 597, 832 P.2d at 614 ("If 'substantial evidence' exists to support the verdict, we will not disturb the jury's decision."). Accordingly, we find no error.

The judgment of convictions and the sentences imposed are affirmed.

DRUKE, C.J., and FLOREZ, P.J., concur.

as provided for in the rule.