135 Cal.Rptr.2d 727 (2003)
109 Cal.App.4th 978
The PEOPLE, Plaintiff and Respondent,
v.
David V. CARSON, Defendant and Appellant.
No. B153072.
Court of Appeal, Second District, Division Seven.
June 12, 2003.
Review Granted September 10, 2003.
*728 Chris R. Redburn, under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Robert F. Katz and William T. Harter, Supervising Deputy Attorneys General, for Plaintiff and Respondent.
MUÑOZ (AURELIO), J.[*]
David V. Carson (Defendant) appeals from judgment entered following a jury trial in which he was convicted of aggravated assault (Pen.Code, § 245, subd. (a)(1)) with the finding as to that count, that he inflicted great bodily injury within the meaning of Penal Code section 12022.7; mayhem (Pen.Code, § 203), and murder (Pen.Code, § 187) with the finding that he discharged a firearm causing death within the meaning of Penal Code section 12022.53, subdivision (d). He was sentenced to state prison for 60 years to life plus life as follows. On the murder count he was sentenced to 25 years to life plus an additional 25 years to life for the use of a firearm. (Pen.Code, §§ 190, subd. (a); 12022.53, subd. (d).) For the aggravated assault he received a midterm sentence of three years plus an additional three years for the great bodily injury enhancement. (Pen.Code, §§ 245, subd. (a)(1); 12022.7, subd. (a).) On the mayhem count he received the midterm sentence of four years which was stayed pursuant to Penal Code section 654. (Pen.Code, § 204.)
On this appeal he contends the court erred in revoking his right to represent himself, the prosecutor interfered with his right to represent himself; the trial court erred in denying his motion to sever the assault/mayhem case from the homicide case and that the court erred by instructing the jury with CALJIC No. 17.41.1.
Because the trial court wrongfully terminated defendant's right to self-representation, we reverse the judgment of conviction under compulsion of Faretta v. California (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (Faretta).

I

DEFENDANT'S RIGHT OF SELF-REPRESENTATION WAS WRONGFULLY TERMINATED

A. Facts leading up the revocation of the right to self-representation.
On December 6, 2000, defendant made a motion to represent himself. The trial court granted the request and appointed an attorney to act as standby counsel. Defendant then requested discovery so that he could prepare his defense. Thereafter, on February 7, 2001, a hearing was held and the prosecutor gave defendant, his investigator and standby counsel the discovery information. Under Penal Code section 1054.2,[1] if a defendant is acting as *729 his own attorney, he is only entitled to certain discovery. Thus, defendant's investigator, his standby counsel, but not defendant, received certain information including, apparently, a "rap sheet" for one of the prosecution witnesses.
On March 19, 2001, defendant indicated he was having problems with his investigator. Because of those problems, on March 22, Mr. Richardson (Richardson) was appointed as defendant's new investigator. Upon Richardson's appointment, he was given a copy of the murder book which he took to defendant and left for defendant to sift through to determine what defendant had and did not have. The next day Richardson picked up the murder book and, apparently, visited the prosecutor. When the prosecutor realized defendant had received and looked at some "rap sheets" and DMV records of witnesses, he immediately notified the court. The court then ordered the sheriff to remove all documents from defendant's jail cell. The documents were placed in three separate boxes, sealed and taken to the trial judge.
At the next scheduled hearing, the court informed counsel of the facts and stated "[I]t appears that there were certain items that might have been delivered to Mr. Carson in error and Mr. Carson was not there were certain items that specifically Mr. Carson was not to have in his possession, might have been delivered to him, and that he had these items in his possession in the jail."
The prosecutor added that some documents, which had not been redacted and contained witnesses' phone numbers, addresses, and rap sheets,[2] had been left with defendant overnight. The prosecutor also noted he was aware of the fact that at various times defendant had attempted to get these items through the standby counsel even though defendant was aware that the "court is the vehicle that determines what discovery is appropriate."[3]
The prosecutor further argued that it was clear defendant understood the discovery process, that he knew he was not entitled to view these documents and had taken advantage of the fact that there was a new investigator on the case. The prosecutor continued that while he did not know what was presently in the boxes ordered seized by the court, he knew from the investigator that defendant had possessed, for a period of time, documents the defendant knew he was not entitled to possess. The prosecutor then proceeded to recite the history of the case, accused defendant of making "active attempts that are documented to set up alibis, suborn perjury, and both from witnesses for an *730 alibi as well as setting up another individual as the person to commit (sic) the crime."[4] The prosecutor concluded by urging the court "to take a serious look at [defendant's] pro per status and whether or not he is going to abuse this process, whether or not he has exceeded the rights of that status."
The court questioned investigator Richardson who stated he gave defendant "the murder book, and [defendant] was going to sift through it to see if [there was] anything he didn't have." Richardson stated after he told the court what happened, he went back to defendant the next day and defendant gave him a list of things that he wanted the investigator to copy. Defendant returned the murder book to the investigator and those items defendant wanted copied were removed from the murder book. Richardson stated he "got back approximately what was missing." Richardson stated defendant had assured him that he had the murder book given to him by the previous investigator, Ms. Hadley. Ms. Hadley stated she had only given him transcripts.
Defendant responded to the court that he had been given the murder book and at the time, he did not know what was being handed to him. The investigator told him to take a look at it and let him know what was missing and what he wanted. Defendant acknowledged, "There was a lot of stuff. Well, everything was unredacted but I have no interest in obtaining any of these numbers because unfortunately like we have gone over on record, 80 percent of the numbers are people that I know, that I already have memorized, that are friends of mine or family members. The only things that were new to me would have been information that was gathered in 2000, because the chronology stopped in I believe March of 2000. So anything new I don't have. [¶] Nor did I take privy [sic] to that information, because the things that I ran across ... I specifically left those things alone because I knew that I wasn't supposed to have them." Defendant stated he did not copy any names, phone numbers or addresses of anyone that he was not supposed to have. He was "very, very careful not to do that." He had put the rap sheets aside for Dayton Calli, because he was "a three striker" and had a long list of felonies and defendant wanted the rap sheet information for impeachment issues.
The prosecutor responded that witness Calli had been threatened many times; that inmates were saying to him they "have paper on [him] ... is jail lingo for we've got the report that shows that you ... ratted out."[5] The prosecutor added that if defendant had the stack of documents that was brought to the prosecutor, half of the documents were denied by the court to defendant. The prosecutor argued that it was specious and disingenuous for defendant to argue he was not aware he was not entitled to the documents, "when these are this [sic] very issues the court was brought up on the writ."
The prosecutor argued this was an "extraordinarily sensitive case.... It contains people's phone numbers and addresses ... they're only loosely connected. There are many civilian witnesses in the case [and] it would be easy to intimidate those witnesses." The prosecutor argued that had this happened earlier in the process it would have been much more credible for defendant to claim he was not familiar with what he was entitled to. "Since we have come back on multiple discovery motions, *731 the court has addressed what he is to have. There are various times he has attempted appellate remedy. To say I think this is all an accident isI think it's disingenuous. I think it's dangerous based on the posture in the case. [¶] Once again, if he didn't have a history of creating an atmosphere to suborn perjury, if there isn't a history, if this craze of ... a jail inmate being threatened, then I think that we can look at this as relatively harmless. But the fact of this matter is [defendant] has to live with that history just as well as the People do.... [Documents were taken out of his cell that support the fact that he attempted to suborn perjury, create an alibi with multiple witnesses, so that's the area of concern for the People."
Defendant acknowledged that some items were turned over to him through inadvertence and that he had them in his possession for approximately nine hours. He did not know what was being turned over exactly and had to look through them to find out what he did not have.
The court stated it felt defendant had "already done things that [he was] not supposed to do. That [he had] already received information that [he] knew [he was] not to receive. That [he] had that information in [his] possession for a period of time. This was information that was not to be in [his] possession...." The court stated it was its opinion that defendant was "a very, very manipulative person and was no longer entitled to [his] pro. per. privileges." The court revoked defendant's propria persona privileges and appointed his standby counsel to represent defendant.

B. The court erred in terminating defendant's right to self-representation because of out-of-court conduct
In Faretta, supra, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 the United States Supreme Court held that a defendant in a criminal case has the right under the Sixth Amendment to self-representation. In footnote 46 the court noted that the right could be terminated if the "defendant . . . who deliberately engages in serious and obstructionist misconduct." (Id, at p. 835, fn. 46, 95 S.Ct. 2525.) In the same footnote the Faretta court specifically referred to Illinois v. Allen (1970) 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 as an example of how a defendant could forfeit his Sixth Amendment right to even be present in the courtroom for his trial. (Faretta, supra, 422 U.S. at p. 835, 95 S.Ct. 2525) In Allen, the defendant had acted as his own attorney and, while doing so, had threatened the judge, and was abusive towards the court and the court process. He was thereafter periodically excluded from the courtroom and the trial was apparently conducted by his appointed standby counsel. In affirming the conviction, the court stated that a defendant could lose his right to be present in the courtroom and impliedly his right to self-representation by being deliberately disruptive. (Illinois v. Allen, supra, 397 U.S. at p. 345, 90 S.Ct. 1057.) As the court noted, a contempt sentence has little or no effect upon a defendant who is facing a severe sentence and wants to disrupt, if not halt, the proceedings. (Id. at pp. 344-345, 90 S.Ct. 1057.) In McKaskle v. Wiggins (1984) 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 the court gave further guidance on termination of the right of self-representation when it stated the defendant must be "able and willing to abide by rules of procedure and courtroom protocol." (Id. at p. 173, 104 S.Ct. 944.)
As noted by both counsel, there appears to be a dearth of law in the area of terminating a defendant's right of self-representation for out-of-court conduct. Most of the law dealing with limitations on the right to self-representation have dealt with *732 the initial granting of or denial of the right (see, e.g., People v. Rudd (1998) 63 Cal. App.4th 620, 73 Cal.Rptr.2d 807 and the cases discussed therein) or the termination of the right to self-representation because of conduct in the courtroom that was either disruptive (Vanisi v. State (Sup.Ct. 2001) 117 Nev. 330, 22 P.3d 1164, 1171 [defendant interrupted others, repeated himself over and over and stood up and rocked back and forth and at times talked out loud to himself so that it was impossible to know if he was addressing the court or talking to himself]; United States v. Brawn (7th Cir.1986) 791 F.2d 577 [defendant refused to proceed, was held in contempt and right to self-representation revoked]) or obstructive. (United States v. Brock (7th Cir.1998) 159 F.3d 1077 [defendant refused to proceed if he did not get his way]; State v. Whalen (1997) 192 Ariz. 103, 961 P.2d 1051 [defendants refused to cross bar because court had a flag with gold fringe and crossing the bar would have been consenting to the court's jurisdiction; additionally defendants insisted they had the right to leave the courtroom whenever they chose].)[6]
Counsel have not cited the court to any cases and this court has not been able to find any cases where the court has rescinded an order granting a defendant the right to self-representation because of conduct outside of the courtroom. In one case, State v. Christian (Minn.Sup.Ct.2003) 657 N.W.2d 186, the defendant, who was on trial for three murders, made a motion for self-representation during voir dire of the jury. The motion was granted, but the next day the court reversed itself and rescinded the defendant's right to self-representation stating the motion had only been made for the purpose of delay. On appeal following the convictions, a majority of the Minnesota Supreme Court affirmed by holding that, in Minnesota, a trial commences when voir dire commences. Once voir dire commences, a motion for self-representation is addressed to the sound discretion of the court. The court further stated that even though the trial court had granted the motion, it had used the wrong standard. Thus, it was within the trial court's discretion to deny the motion the next day. Three dissenters stated, "In reaching this conclusion, the court has answered the wrong question. The relevant question to be answered is whether, having granted Christian the right to represent himself, the trial court abused its discretion when it rescinded the order granting that right without finding that Christian had deliberately `engaged in serious and obstructionist misconduct.' See Faretta v. California, 422 U.S. 806, 834 [f]n. 46 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975)." (Id. at pp. 194-195.)
In the federal courts there are few cases dealing with the termination of the defendant's right of self-representation because of out-of-court activities. In United States v. Flewitt (9th Cir.1989) 874 F.2d 669, the trial court summarily terminated the defendants' self-representation because, in the court's opinion, the defendants would not prepare for trial and this was an indication they were incapable of representing themselves.[7] In reversing the conviction *733 the court stated, "We do not construe the footnote to mean that a defendant's Sixth Amendment right to self-representation so vigorously upheld by the Supreme Court in Farettamay be extinguished, as it was in this case, due to the defendant's lack of preparation prior to trial. The Court expressly denies in the footnote that the right of self-representation is `a license not to comply with relevant rules of procedural and substantive law.' Faretta, 95 S.Ct. at 2541 [f]n. 46. There is no indication that a failure to comply with such rules can result in a revocation of pro se status. Instead, the footnote indicates the Court's meaning to be that a defendant cannot claim `ineffective assistance of counsel' flowing from his failure to follow the rules of procedure or from his misinterpretation of the substantive law. If he chooses to defend himself, he must be content with the quality of that defense." (United States v. Flewitt, supra, at p. 674.) Flewitt has been cited in numerous cases but this court has been unable to find any cases where the defendant's right of self-representation has been rescinded because of the defendant's out-of-court conduct.
In this state there are apparently only two reported cases that have dealt with terminating a defendant's right to self-representation for conduct other than that which is "serious or obstructionist" as set forth in Faretta.[8] In Ferret v. Superior Court (1978) 20 Cal.3d 888, 144 Cal.Rptr. 610, 576 P.2d 93 (Ferrel) the defendant was charged with robbery (Pen.Code, § 211), kidnapping (Pen.Code, § 209), rape (Pen.Code, § 261.3, subd. 3) forcible oral copulation (Pen.Code, § 288a) aggravated assault (Pen.Code, § 245a, subd. (a)) and violations of the dangerous weapons laws (Pen.Code, § 12021). He was allowed to represent himself, but while the trial was pending, the defendant was found to have abused several jail rules such as using his legal runner as a conduit to take defendant's illegal gambling winnings out of the county jail, damaging a telephone and violating several other jail rules. Based upon the defendant's conduct, the trial revoked the defendant's right to self-representation. In ordering the trial court to reinstate the defendant's right to self-representation, the court stated, "Since it is manifest that the right to present a defense must necessarily be exercised in court, we conclude that an accused should only be deprived of that right when he engages in disruptive in-court conduct which is inconsistent with its proper exercise." (Ferrel, supra, 20 Cal.3d at p. 891, 144 Cal.Rptr. 610, 576 P.2d 93.)
In People v. Poplawski (1994) 25 Cal. App.4th 881, 30 Cal.Rptr.2d 760 the defendant was charged with driving under the influence of alcohol with three prior convictions (Veh.Code, §§ 23152, subd. (a), 23175) and also with driving with a suspended or revoked license (Veh.Code, § 14601.2 subd. (a)). When the defendant, whose primary language was Polish, expressed dissatisfaction with appointed counsel, the court granted the defendant's motion for self-representation. About three weeks later, the case came up for *734 trial before a different judge. Even though there was no motion for appointment of counsel pending, the second judge revoked the defendant's right to self-representation and appointed counsel based upon: "(1) `the language problem it had experienced with defendant'; (2) defendant's lack of familiarity with `legal language,' as demonstrated by his ignorance of the meaning of the word `motion'; and (3) the court's doubts as to whether defendant had a sufficient understanding of the proceedings." (People v. Poplawski, supra, 25 Cal.App.4th at p. 891, 30 Cal. Rptr.2d 760.) In reversing the convictions, the court stated that even if the factors were relevant, the record did not support the court's findings.[9] The court further stated once a defendant has requested and been permitted to act as his own counsel, the court may not take away that right of self-representation unless he engages in the type of conduct prohibited by Faretta and Ferrel.
Here, defendant engaged in no disruptive or obstructive conduct. His investigator left him some information to which, questionably, he was not entitled. If the court felt the defendant's actions required a sanction of some type it could have fashioned a sanction. Instead, the court, at the behest of the prosecutor,[10] rescinded defendant's propria persona status because of defendant's out-of-court conduct. This was Faretta error. (Ferrel, supra, 20 Cal.3d 888, 144 Cal.Rptr. 610, 576 P.2d 93; Flewitt, supra, 874 F.2d 669.) "Faretta error is reversible per se. (McKaskle v. Wiggins (1984) 465 U.S. 168,177, fn. 8 [104 S.Ct. 944, 79 L.Ed.2d 122], (McKaskle); People v. Joseph (1983) 34 Cal.3d 936, 948 [196 Cal.Rptr. 339, 671 P.2d 843].)" (People v. Welch (1999) 20 Cal.4th 701, 729, 85 Cal.Rptr.2d 203, 976 P.2d 754.)
We can sympathize with the problems confronting trial courts when they have propria persona defendants with serious charges before them. Many of the propria persona's are manipulative, argumentative and seek extra privileges because of their propria persona status. They often insist in wandering into annoying irrelevancies and are adamant in their belief that they, and only they, can handle their own case. Although a trial court may personally feel the defendant's best interests would best be served if the motion was denied and competent counsel appointed, Faretta does not permit that. (People v. Dent, supra, 30 Cal.4th 213, 132 Cal.Rptr.2d 527, 65 P.3d 1286, 2003 Cal. LEXIS 2086.)[11] For better or worse, trial *735 courts are obligated to allow those defendants that want to represent themselves to do so.[12]"Faretta was meant by the United States Supreme Court for just such people. We have no alternative but to reverse the judgment of conviction and grant defendant a new trial where he may represent himself." (State v. Richards (1990) 456 N.W.2d 260, 266.)

II.

MOTION TO SEVER COUNTS
Because this issue is likely to reoccur we will address it. Additionally, because defendant did have a trial, we can address this issue in light of the evidence received at trial.
Defendant filed a motion to sever counts 1 and 2, the assault and mayhem charges from count 3, the murder charge. He argued that while the felonies were the same class of crime, the counts should be severed because there was no cross-admissibility of evidence, the introduction of the evidence relating to the assault and mayhem charges would likely inflame the jury regarding the far more serious charge of murder, and that the murder count was a weak case and its joinder with the other counts would likely make it stronger.
The court denied the motion to sever, finding the charges to be the same class of crimes. The court noted that while evidence would be introduced that is prejudicial to defendant, that was the nature of the criminal trial. The court, however, was confident that the jury would follow the instructions given, i.e., that they were to decide each charge separately. The court found the defense had not shown the trial of the case, as set forth in the information, would be so prejudicial to defendant that it would deny him the opportunity to have a fair trial.
Penal Code section 954 provides in pertinent part, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crime or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."
"Offenses are of the same class when they possess common attributes.... [Citation.] Crimes are of the same class when they all involve assaultive crimes against the person. [Citation.]" (People v. Leney (1989) 213 Cal.App.3d 265, 269, *736 261 Cal.Rptr. 541.) As such the joinder of these three charges was proper.
"Since the requirements for joinder were satisfied, defendant can predicate error only on a clear showing of potential prejudice. [Citation.] `The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.] [¶] `The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial' [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a `weak' case has been joined with a `strong' case, or with another `weak' case, so that the `spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]" (People v. Sandoval (1992) 4 Cal.4th 155, 172-173, 14 Cal.Rptr.2d 342, 841 P.2d 862.)
While evidence in the murder charge and the assault/mayhem charges was not cross-admissible, that was just one factor to consider in assessing possible prejudice. Contrary to defendant's claim, the evidence in both incidents was sufficiently strong to render joinder proper. While defendant admitted striking victim Gomez but did not admit shooting victim Rodriguez, the evidence that defendant was the shooter is compelling. His gun was involved in the murder and there was extensive evidence that he fabricated an alibi and attempted to get someone else to confess to the crime demonstrating consciousness of guilt. Additionally, neither of the charges was more likely to inflame the jury against the defendant. Neither victim was more vulnerable or sympathetic than the other. The victims knew each other and apparently socialized together. Victim Gomez bought drugs from victim Rodriguez and in fact introduced Rodriguez to defendant so defendant could purchase drugs. Based on the foregoing, we cannot say the trial court abused its discretion in refusing to sever the charges.

DISPOSITION
The judgment is reversed, and the case remanded to the trial court for further proceedings consistent with this opinion.
We concur: PERLUSS, P.J, and JOHNSON, J.
NOTES
[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Penal Code section 1054.2 was part of Proposition 115 which was enacted by the voters as an initiative in 1990. Subdivision (a) prohibits an attorney from disclosing to the defendant, his family or anyone, the address or phone number of a victim or witness whose name has been disclosed in discovery unless specifically permitted to do so by the court. In relevant part subdivision (b) provides, "If the defendant is acting as his or her own attorney, the court shall endeavor to protect the address and telephone number of a victim or witness by providing for contact only through a private investigator licensed by the Department of Consumer Affairs and appointed by the court or by imposing other reasonable restrictions, absent a showing of good cause as determined by the court."
[2] The prosecutor noted that with regard to rap sheets, he only released them to the investigator's representative after seeking a court order because there is civil liability if they are released not pursuant to a court order. Query as to how a defendant who is representing himself is able to impeach a witness if he does not have the witness's rap sheet. (See People v. Perez (1962) 58 Cal.2d 229, 237-240, 23 Cal.Rptr. 569, 373 P.2d 617; People v. Williams (1991) 228 Cal.App.3d 146, 152, 278 Cal.Rptr. 801; People v. Bryson (1967) 257 Cal.App.2d 201, 64 Cal.Rptr. 706.)
[3] The court order authorizing release of the documents only to the investigator is not in the clerk's transcript nor are any of the other discovery orders.
[4] This conduct had occurred while defendant was represented by counsel, which was prior to defendant being granted his right to self-representation.
[5] Other than the prosecutor's allegations there was no evidence presented to the court of this fact.
[6] In Whalen, the court noted the defendant's intractability was not as inconsequential as would first appear. For example, the court noted that because appellant would not cross the bar, each time there was a side bar conference, the court, prosecutor, clerk, standby counsel and the reporter would have had to venture en masse to wherever defendant was seated at the time. (State v. Whalen, supra, 192 Ariz. 103, 961 P.2d at p. 1056, fn. 8.)
[7] The trial court stated, "For reasons known best to yourselves, you are not ready for trial and you will not get ready to (sic) trial nor will you do the necessary preparation in order to be ready for trial.... [¶] But the trial is going to go forward. I am going to find that you are incapable of effectively representing yourselves. You are bright individuals. I don't know if it is the complexity of the case or whether you are, as I suspect, maybe attempting to make a record that will bring about a successful appeal. [¶] But I am going to rule that you are not capable of further self-representation. I am going to terminate your representation of yourselves, and I am going to re-appoint standby counsel. That order is effective forthwith." (United States v. Flewitt, supra, 874 F.2d at p. 672.)
[8] In at least two cases, convictions were affirmed after the trial judge revoked the defendants' right to self-representation because of disruptive actions during the trial. (See People v. Clark (1992) 3 Cal.4th 41, 115-116, 10 Cal.Rptr.2d 554, 833 P.2d 561; People v. Davis (1987) 189 Cal.App.3d 1177, 1187, 234 Cal.Rptr. 859, disapproved on another ground in People v. Snow (1987) 44 Cal.3d 216, 225, 242 Cal.Rptr. 477, 746 P.2d 452.)
[9] The court stated, "Even if these factors were relevant, they would not provide a valid basis for terminating defendant's self-representation in this instance. Although the record of both the January 5 and January 20 proceedings reflects various grammatical and syntactical errors on defendant's part, it does not demonstrate that defendant was so deficient in the English language that he could not communicate adequately for purposes of self-representation. To the contrary, defendant had a sufficient knowledge of English so as to understand and respond to the inquiries of each judge in a reasonable manner." (People v. Poplawski, supra, 25 Cal.App.4th at p. 891, 30 Cal.Rptr.2d 760.)
[10] See People v. Murphy (2003) 107 Cal. App.4th 1150, 132 Cal.Rptr.2d 688, 2003 DJDAR 4057 where a conviction was reversed because the defendant had been denied his right of confrontation based upon a prosecutor's unsworn representations. (See also the court's comments in People v. Dent (2003) 30 Cal.4th 213, fn. 2, 132 Cal.Rptr.2d 527, 65 P.3d 1286, 2003 Cal. LEXIS 2086.) "The prosecution bears some of the responsibility for this reversal. Prosecutors should always be acutely aware that violation of the right of self-representation is reversible per se."
[11] In Dent, even though defendant had received a fair trial, the court was compelled to reverse a murder conviction and death penalty verdict because of the denial of the defendant's right to self-representation.
[12] Although this does not appear the case to do so, we suggest our Supreme Court, in a proper case, revisit Ferrel v. Superior Court, supra, 20 Cal.3d 888, 144 Cal.Rptr. 610, 576 P.2d 93 and reexamine the issue of when a trial court may terminate the defendant's right of self representation. (See, e.g., United States v. Dougherty (D.C.Cir.1972) 472 F.2d 1113, 1124-1126 [courts may appoint standby counsel to represent defendant who is representing himself if the defendant begins to subvert the core concept of a trial].) Dougherty was one of the two cases cited by Justice Stewart in Faretta's brief discussion of the trial court's authority to terminate the right of a defendant to represent himself when he engages in obstructionist conduct. (See Faretta, supra, 422 U.S. at pp. 834-835, fn. 46, 95 S.Ct. 2525.) Although far from unambiguous, we believe that this reference suggests the Faretta court intended to embrace Dougherty's standard for termination of the right of self representation: does the defendant's misconduct seriously threaten the core integrity of the trial. Termination of the right of self-representation is a severe sanction and must not be imposed lightly. Nonetheless, we believe trial courts should be given sufficient discretion when confronted with behavior whether occurring in-court or out-of-court that threatens to compromise the court's ability to conduct a fair trial. (Cf. Illinois v. Allen, supra, 397 U.S. at p. 343, 90 S.Ct. 1057.)