SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, ) | Arizona Supreme Court |
| ) | No. CR-10-0358-AP |
| Appellee/Cross-Appellant, ) | |
| ) | Maricopa County |
| v. ) | Superior Court |
| ) | No. CR2000-090114 |
| FABIO EVELIO GOMEZ, ) | |
| ) | |
| Appellant. ) | |
| ) | **O P I N I O N** |
| _____ ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Kent E. Cattani, Division Chief Counsel
          Jeffrey A. Zick, Section Chief Counsel
          Capital Litigation Section
          Laura Chiasson, Assistant Attorney General      Tucson
Attorneys for State of Arizona

MICHAEL J. DEW ATTORNEY AT LAW                           Phoenix
     By   Michael J. Dew
Attorney for Fabio Evelio Gomez
_____

**B A L E S**, Vice Chief Justice

¶1      This automatic appeal concerns Fabio Evelio Gomez's 2010 death sentence for murdering Joan Morane. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031, -4032, and -4033(A) (2011).

**FACTS AND PROCEDURAL BACKGROUND**

¶2      Joan lived in an apartment complex where Gomez also

lived with his girlfriend and infant son. In December 1999, a friend found Joan's door unlocked and furniture in disarray. Joan was missing. That same day, a neighbor heard pounding on Gomez's bathroom wall and a woman screaming. When questioned by police, Gomez said he had been home all day and had not seen Joan or heard any screaming. The next day, police saw blood on an inflatable raft that Gomez had placed in his girlfriend's car.

¶3        When Gomez allowed police to enter his apartment, they saw blood on the living room carpet and the bathroom walls. Gomez initially told police that his girlfriend had cut her foot, but later said the blood was from a cat he had killed because it had scratched his son's face. Police discovered Joan's body in a dumpster at the apartment complex. DNA testing identified Gomez's semen in Joan's body and Joan's blood in Gomez's apartment.

¶4        In 2001, a jury convicted Gomez of first degree murder, kidnapping, and sexual assault. Before he was sentenced, the United States Supreme Court held that Arizona's death penalty statutes were unconstitutional because they allowed a judge, rather than a jury, to find aggravating factors that could result in a death sentence. *Ring v. Arizona*, 536 U.S. 584 (2002). The legislature then amended the death penalty statutes. Based on these amendments, the trial court reset the

matter for a jury sentencing hearing.

**¶5** In 2003, a second jury found that the murder was especially cruel and depraved, *see* A.R.S. § 13-751(F)(6)(2011), and determined that Gomez should be sentenced to death. *State v. Gomez*, 211 Ariz. 494, 498 ¶ 16, 123 P.3d 1131, 1135 (2005). This Court affirmed Gomez's convictions and his sentence for sexual assault. *Id.* at 505 ¶ 53, 123 P.3d at 1142. The Court vacated Gomez's death sentence because he had been shackled in the jury's presence contrary to *Deck v. Missouri*, 544 U.S. 622 (2005), and also vacated his aggravated sentence for kidnapping. *Gomez*, 211 Ariz. at 505 ¶¶ 51, 53, 123 P.3d at 1142.

**¶6** On remand, a third jury found the (F)(6) "especially cruel" aggravator and determined Gomez should be sentenced to death for Joan's murder; the trial court also resentenced him for the kidnapping.

## DISCUSSION

### A. Revocation of Pro Per Status

**¶7** Gomez argues that, after the case was remanded for resentencing, the trial court erred by revoking his pro per status and appointing counsel to represent him. At the initial sentencing trial, Gomez represented himself until closing arguments, when he chose to be represented by advisory counsel. *Gomez*, 211 Ariz. at 498 ¶ 16, 123 P.3d at 1135. On remand in 2006, the trial court granted Gomez's request to represent

3

himself in the resentencing and appointed a mitigation expert and advisory counsel to assist him. Nearly three years later, the trial court revoked Gomez's pro per status, noting that Gomez had been unable to comply with the court's deadlines and the disclosure rules for criminal cases.

¶8        A trial court's decision to revoke a defendant's self-representation is reviewed for an abuse of discretion. *See State v. Martin*, 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967). "The right to counsel under both the United States and Arizona Constitutions includes an accused's right to proceed without counsel and represent himself," *State v. Lamar*, 205 Ariz. 431, 435 ¶ 22, 72 P.3d 831, 835 (2003), "but only so long as the defendant 'is able and willing to abide by the rules of procedure and courtroom protocol.'" *State v. Whalen*, 192 Ariz. 103, 106, 961 P.2d 1051, 1054 (App. 1997) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984)).

¶9        The trial court revoked Gomez's right to self-representation only after repeatedly admonishing him to comply with court rules and deadlines and that noncompliance could result in the loss of his pro per status. In May 2007, after Gomez had represented himself for ten months, the trial court instructed Gomez, his advisory counsel, and his mitigation consultant that they needed to set a realistic schedule for completing their mitigation investigation so the court could set

4

a trial date.  The mitigation specialist responded that he would need time to travel to the Dominican Republic (where Gomez lived until 1987) and elsewhere outside Arizona to interview people.  In August 2007, the court set a "firm" trial date for September 2, 2008; set a disclosure deadline; and told Gomez that, if he failed to follow the rules and prepare for the resentencing trial, his pro per status would be revoked.

¶10     In May 2008, Gomez told the court that he needed at least another eighteen months to prepare.  On the recommendation of a mitigation special master, the trial court reset the trial for June 1, 2009.  The court again warned Gomez to comply with the court rules and that his pro per status would be revoked if he was not prepared on the rescheduled date.  After advisory counsel told the court that the defense would get a psychologist expert and complete testing of Gomez by November 2008, the mitigation special master set a deadline of November 15, 2008 for completing all psychological testing.  Despite this deadline, Gomez twice failed to meet with defense psychologists who came to interview him.

¶11     In November 2008, the trial court denied Gomez's motion to change advisory counsel and again warned Gomez that he would lose the right to represent himself if he did not follow court rules.  The next month, the court denied Gomez's request to extend the discovery deadlines; ordered Gomez to make all

required disclosures by January 23, 2009; and affirmed the June 1, 2009 trial date. In violation of that order and Rule 15.2 of the Arizona Rules of Criminal Procedure, Gomez, in January 2009, disclosed the names of some 360 witnesses for the resentencing trial, including a neuropsychologist and a psychologist, without also disclosing any expert reports. The listed witnesses included more than 150 "out of state character witnesses," more than 70 police officers, Gomez's former defense attorneys, 2 former Arizona attorneys general, and a former Arizona governor. The disclosure did not include addresses for the witnesses. It suggested that Gomez intended to offer evidence challenging the police investigation of the murder or the validity of his convictions, matters that the trial court had told Gomez were not at issue in the resentencing proceeding.

¶12     After the State moved to obtain the required disclosures, the trial court gave Gomez until March 25, 2009 to "fully comply with Rule 15.2" and again warned Gomez that his failure to follow the rules could result in loss of his pro per status. On March 25, Gomez filed a notice again listing hundreds of witnesses; he included telephone numbers or addresses for about eighty. At a hearing on March 30, he told the court that he "still [had] many other things" he needed to do and that the identified neuropsychologist and psychologist experts had not yet examined him. Advisory counsel subsequently

disclosed two new psychologist experts and told the court that these experts would examine Gomez in April and their reports would be ready before the June 1, 2009 trial date. Noting that this timetable would allow the State little time to obtain rebuttal evidence, the court set a hearing to show cause why it should not revoke Gomez's pro per status and assign counsel to represent him.

¶13 At the April 14, 2009 show cause hearing, Gomez said he had done everything he had been told to do, he wished to continue representing himself, and he was ready to proceed with his resentencing trial. Finding that Gomez had been unable to comply with Rule 15, the trial court revoked his pro per status and reset the trial date for September 2009. The court also appointed the two lawyers who had served as advisory counsel since 2006 (Herman Alcantar, Jr. and Christopher Flores) to represent Gomez. The trial was subsequently postponed due to conflicts in the attorneys' schedules and did not occur until September 2010.

¶14 Gomez argues that the trial court erred in revoking his pro per status for several reasons. First, he contends that he complied with Rule 15's disclosure requirements and that, if he failed to do so, the trial court should have precluded his witnesses rather than revoke his pro per status. Second, he states that his appointed counsel did not add to his pro per

7

disclosures and did not ultimately present any experts, and that the trial did not take place until seventeen months after his pro per status was revoked.  Finally, he argues that revocation is not appropriate unless a pro per defendant engages in "serious obstructionist conduct" in the courtroom, citing *United States v. Johnson*, 610 F.3d 1138, 1144 (9th Cir. 2010).

**¶15**    We disagree.  "[A] defendant who proves himself incapable of abiding by the most basic rules of the court is not entitled to defend himself."  *Deck*, 544 U.S. at 656. Accordingly, a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."  *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975).  As *Faretta* acknowledges, a self-represented defendant must not only respect the dignity of the courtroom, but also "comply with relevant rules of procedural and substantive law."  *Id.*  Thus, a trial court may revoke pro per status for serious violations of court orders and rules even if the conduct occurs outside a courtroom proceeding.

**¶16**    Gomez demonstrated over several years that he could not comply with court deadlines and the disclosure rules.  The trial court repeatedly warned Gomez that his noncompliance could result in loss of pro per status.  The trial court revoked that status only after it had become evident that Gomez's continued self-representation would undermine the court's authority and

8

ability to conduct the proceeding in an efficient and orderly manner. *Cf. Whalen*, 192 Ariz. at 107-08, 961 P.2d at 1055-56 (upholding trial court's revocation of pro per status when defendant failed to comply with a court order to conduct defense from the front of courtroom). That the trial court might have precluded witnesses as a sanction for Gomez's violations of Rule 15.2 does not mean that the court was prevented from revoking his pro per status. Gomez's conduct gave the trial court ample grounds to revoke his pro per status in April 2009 - a conclusion that is not affected by the later postponement of the trial until September 2010 or by Gomez's assertions that his appointed counsel did not provide any additional disclosures and ultimately did not present expert witnesses.

¶17    The trial court did not abuse its discretion by revoking Gomez's pro per status and appointing counsel to represent him.

B.    **Denial of Requests for Change of Counsel**

¶18    Gomez argues that the trial court erred by not holding an evidentiary hearing before denying requests by him and his lawyer for the appointment of new counsel. We review a trial court's decision to deny a request for new counsel for abuse of discretion. *State v. Moore*, 222 Ariz. 1, 15 ¶ 77, 213 P.3d 150*, 164 (2009).

¶19    The Sixth Amendment guarantees criminal defendants the

9

right to representation by counsel, but "an indigent defendant is not 'entitled to counsel of choice, or to a meaningful relationship with his or her attorney.'" *State v. Torres*, 208 Ariz. 340, 342 ¶ 6, 93 P.3d 1056, 1058 (2004) (quoting *State v. Moody*, 192 Ariz. 505, 507 ¶ 11, 968 P.2d 578, 580 (1998)). A defendant's Sixth Amendment right to counsel is violated "when there is a complete breakdown in communication or an irreconcilable conflict between a defendant and his appointed counsel." *Id.* "Conflict that is less than irreconcilable, however, is only one factor for a court to consider in deciding whether to appoint substitute counsel." *State v. Cromwell*, 211 Ariz. 181, 186 ¶ 29, 119 P.3d 448, 453 (2005).

¶20 On December 8, 2009, nearly five weeks before the resentencing trial was then scheduled to begin, Gomez filed a pro per "motion for change of counsel." He alleged that Alcantar, his appointed lead counsel, had not visited him in more than a year, had not devoted enough time to prepare the case, and was unprofessional. Gomez further alleged that he did not trust Alcantar because the lawyer had submitted excessive bills while acting as advisory counsel and had not deposited money into Gomez's account for stamps and supplies. Gomez also asserted that Flores, his other attorney, was not qualified to handle a death penalty case. Finally, Gomez complained that he had "been subjected to the t[y]pical unethical actions of [an]

irresponsible Court appointed defense attorney . . . with whom [Gomez] has an actual major conflict of interest, and an irredeemable client-attorney relationship."

¶21     On December 18, 2009, attorney Christopher Dupont filed a "motion to determine counsel," stating that he was specially appearing because the Consulate of the Dominican Republic intended to retain him to represent Gomez at the resentencing hearing.    This motion criticized Alcantar's representation, asserted that there had been a complete fracture in Gomez's relationship with his counsel, and requested an evidentiary hearing.    At two subsequent hearings, however, DuPont said he would not represent Gomez.

¶22     On February 4, 2010, Alcantar filed a Motion to Withdraw as Counsel of Record.    This motion alleged that Dupont had "broken any confidence Mr. Gomez had in his legal team" and "poisoned" counsel's relationship with Gomez, specifically noting difficulties the defense team had communicating with mitigation witnesses.    Alcantar claimed that "the defendant's family in the Dominican Republic will no longer speak to the Mitigation Specialist because she [sic] was informed . . . that the defense team was not helping Mr. Gomez."

¶23     Three weeks later, the court held a pretrial conference attended by Gomez, Alcantar, and DuPont.    The court, without objection, announced that it would decide the pending

matters without an evidentiary hearing or oral argument. It struck Dupont's motion to determine counsel and denied Alcantar's motion to withdraw. The court also denied Gomez's motion for change of counsel, finding "an insufficient showing in the motion to demonstrate that a change of counsel is necessary, especially considering the age of the case and the timing of the motion in this matter."

¶24     Relying on *Torres*, Gomez now argues that the trial court was required to hold an evidentiary hearing to consider the specific allegations in his motion for change of counsel. He further contends that both his motion and Alcantar's motion to withdraw alleged "an irretrievable breakdown of the attorney-client relationship."

¶25     "[T]o protect a defendant's Sixth Amendment right to counsel, a trial judge has the duty to inquire as to the basis of a defendant's request for substitution of counsel." *Torres*, 208 Ariz. at 343 ¶ 7, 93 P.3d at 1059. But "[t]he nature of the inquiry will depend upon the nature of the defendant's request." *Id*. at ¶ 8. "[G]eneralized complaints about differences in strategy may not require a formal hearing or an evidentiary proceeding." *Id.* Before ruling on a motion for change of counsel, a trial court should consider

> whether an irreconcilable conflict exists between counsel and the accused, and whether new counsel would be confronted with the same conflict; the timing of

12

the motion; inconvenience to witnesses; the time period already elapsed between the alleged offense and trial; the proclivity of the defendant to change counsel; and quality of counsel.

*State v. LaGrand*, 152 Ariz. 483, 486-87, 733 P.2d 1066, 1069-70 (1987).

¶26      In requiring a hearing in *Torres*, the Court noted that the defendant had alleged "that he could no longer speak with his lawyer about the case, he did not trust him, he felt threatened and intimidated by him, there was no confidentiality between them, and his counsel was no longer behaving in a professional manner." *Torres*, 208 Ariz. at 342 ¶ 2, 93 P.3d at 1058. We held that the trial court abused its discretion by summarily denying a motion for change of counsel without inquiring into the "specific factual allegations that raised a colorable claim that he had an irreconcilable conflict with his appointed counsel." *Id*. at 343 ¶ 9, 93 P.3d at 1059.

¶27      The facts of this case are distinguishable from *Torres*. Gomez's motion did not allege facts suggesting that there had been a complete breakdown in communication or an irreconcilable conflict. "A single allegation of lost confidence in counsel does not require the appointment of new counsel, and disagreements over defense strategy do not constitute an irreconcilable conflict." *Cromwell*, 211 Ariz. at 186 ¶ 29, 119 P.3d at 453. Nor did Alcantar's motion to

13

withdraw allege specific facts suggesting a "completely fractured relationship." *Id.* Instead, it contended that Dupont had made it difficult for the defense to communicate with mitigation witnesses and had undermined Gomez's confidence in his legal team.

¶28 Moreover, in denying the requests for change of counsel, the trial court considered the *LaGrand* factors and Alcantar's written responses to Gomez's allegations and Dupont's motion. For example, Alcantar discussed interviews done by the mitigation specialist, motions Alcantar intended to file before trial, why he had not more frequently visited Gomez at the jail (Alcantar said that Gomez had imposed restrictions on the visits and persisted in discussing matters not at issue in the resentencing), and his providing stamps to Gomez and depositing money in Gomez's jail account. The State also provided information to the court about the number of times that the mitigation specialist, the defense investigator, or counsel had gone to the jail to visit Gomez. When the trial court announced it intended to decide the matters on the pleadings, neither Gomez nor any lawyer requested an evidentiary hearing to present additional information.

¶29 A trial judge is not required to hold an evidentiary hearing on a motion for change of counsel if the motion fails to allege specific facts suggesting an irreconcilable conflict or a

14

complete breakdown in communication, or if there is no indication that a hearing would elicit additional facts beyond those already before the court. *See LaGrand*, 152 Ariz. at 486, 733 P.2d at 1069 (noting that "a request for new counsel should be examined with the rights and interest of the defendant in mind tempered by exigencies of judicial economy"). The trial court did not abuse its discretion when it denied the requests for change of counsel without holding an evidentiary hearing.

## C. Sufficiency of Evidence for (F)(6) Aggravator

¶30 Gomez argues that the State did not present sufficient evidence to prove the murder was especially cruel. This argument is subsumed within our independent review, because we determine de novo whether the evidence establishes an aggravating circumstance beyond a reasonable doubt. *See State v. Hargrave*, 225 Ariz. 1, 13 ¶ 41, 234 P.3d 569, 581 (2010).

## D. Independent Review

¶31 Because Gomez committed the murder before August 1, 2002, we independently review his death sentence. *See* A.R.S. § 13-755(A).

### 1. Aggravating Circumstances

¶32 The State alleged that the murder was "especially cruel" for purposes of the (F)(6) aggravating circumstance. To establish especial cruelty, "the state must prove that 'the victim consciously experienced physical or mental pain prior to

15

death, and the defendant knew or should have known that suffering would occur.'" *State v. Prince*, 226 Ariz. 516, 539 ¶ 97, 250 P.3d. 1145, 1168 (2011) (quoting *State v. Snelling*, 225 Ariz. 182, 188 ¶ 25, 236 P.3d 409, 415 (2010)). This Court "'examine[s] the entire murder transaction and not simply the final act that killed the victim.'" *Id*. (quoting *State v. Ellison*, 213 Ariz. 116, 142 ¶ 119, 140 P.3d 899, 925 (2006)).

¶33    The record establishes beyond a reasonable doubt that Joan's murder was especially cruel. The medical examiner testified that Joan suffered eighteen or more blows to her head, at least one of which was inflicted with as much force as that caused by a motor vehicle accident. She also suffered cuts, scrapes, bruises, and bone fractures. Her wounds suggested that Joan was conscious and moving while being beaten. She had defensive wounds and grip marks on her arms indicating that she struggled while being held down with significant force.

¶34    The evidence also indicates that a gag-type ligature was placed around Joan's face and across her neck. Although Joan usually kept a neat apartment, after the attack, a glass table top was knocked over and a heavy living room chair displaced. Joan's blood was found in Gomez's apartment, but not in her own. This evidence suggests Joan was abducted in her apartment and then beaten to death in Gomez's apartment.

¶35    Gomez argues that especial cruelty was not proven

16

because the medical examiner could not determine the "sequence of blows, the consciousness of the victim, and the nature of the bruising" that Gomez inflicted.  This argument fails.

¶36    Joan's injuries, her screams, evidence of a struggle in Joan's apartment, and the fact that she had been gagged all indicate Joan was conscious during part of the attack.  *Cf. State v. Andriano*, 215 Ariz. 497, 511 ¶ 66, 161 P.3d 540, 554 (2007) (finding cruelty where "[d]efensive wounds on [the victim's] hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him"), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

¶37    Regardless of when Joan lost consciousness as result of the eighteen blows to her head, the State proved beyond a reasonable doubt that she was conscious for part of the attack and suffered physically and mentally.  The State also proved beyond a reasonable doubt that Gomez knew or should have known that Joan was suffering physically and mentally.  *See, e.g.,* *id*. (defendant "knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish").

### 2. Mitigating Circumstances

¶38    At the mitigation phase, Gomez presented testimony from family members and others who knew him in the Dominican

17

Republic and established that he had a good upbringing and was treated well by his parents while growing up. During allocution, Gomez asked for an opportunity to obtain an education and to be rehabilitated. On appeal, Gomez states that he had no prior criminal record and that he immigrated to the United States as a self-sufficient professional, sought ways to give back to his adopted country as a coach for young people, cared about his family and community in the Dominican Republic, and was raising an infant son.

¶39    The State disputes Gomez's alleged mitigating factors, contending that his family members and friends from the Dominican Republic had no significant contact with Gomez in the more than ten years between his move to the United States and Joan's murder. At the penalty phase, to contradict Gomez's claims that he was a productive member of society and caring father, the State introduced testimony from the guilt phase in which Gomez admitted using drugs and said that, on the day of the murder, he had smoked marijuana before driving with his infant son in a car and had later left the baby unattended while he engaged in consensual sexual intercourse in another car.

¶40    "A defendant's relationship with his or her family and friends may be a mitigating circumstance, yet the Court has often found that this circumstance should be given little weight." *State v. Tucker*, 215 Ariz. 298, 322 ¶ 116, 160 P.3d

18

177, 201 (2007). Similarly, a defendant's lack of a prior felony conviction "is a mitigating circumstance, but entitled to little weight." *State v. Greene*, 192 Ariz. 431, 442 ¶ 52, 967 P.2d 106, 117 (1998). The mitigating circumstances are not substantial.

### 3. Propriety of Death Sentence

**¶41** We consider the quality and the strength, not simply the number, of aggravating and mitigating factors. *Id.* at 443 ¶ 60, 967 P.2d at 118. Gomez kidnapped and sexually assaulted Joan and brutally bludgeoned her to death. The record does not reflect significant mitigating circumstances. We conclude that "the mitigation is not sufficiently substantial to warrant leniency." A.R.S. § 13-755(B).

### E. Additional Issues

**¶42** Stating that he seeks to preserve certain issues for federal review, Gomez lists eighteen additional constitutional claims that he acknowledges have been rejected in previous decisions. We decline to revisit these claims.

### F. State's Cross-Appeal

**¶43** On cross-appeal, the State argues that the trial court abused its discretion by (1) precluding cross-examination of Gomez after he identified new mitigation and professed his innocence during allocution, and (2) limiting the rebuttal

19

evidence the State presented in response to Gomez's statements during allocution. These issues are moot, however, because we have affirmed Gomez's death sentence, and we accordingly decline to address them. *See*, *e.g.*, *State v. Chappell*, 225 Ariz. 229, 243 ¶ 60, 236 P.3d 1176, 1190 (2010); *State v. McCray*, 218 Ariz. 252, 261 ¶ 46, 183 P.3d 503, 512 (2008).

## CONCLUSION

**¶44**    We affirm Gomez's sentences.


_____
                    Scott Bales, Vice Chief Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice


_____
Donn Kessler, Judge*


* Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Donn Kessler, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.


20