NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CRAIG MURRAY JONES, *Appellant.*

No. 1 CA-CR 15-0372
FILED 8-16-2016

Appeal from the Superior Court in Maricopa County
No.  CR2012-009437-001 DT
The Honorable Margaret R. Mahoney, Judge
The Honorable Pamela D. Svoboda, Judge

**AFFIRMED IN PART; VACATED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By W. Scott Simon
*Counsel for Appellee*

Brown & Little, P.L.C., Tempe
By Matthew O. Brown
*Counsel for Appellant*

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Kenton D. Jones joined.

W I N T H R O P, Presiding Judge:

¶1          Craig Murray Jones ("Appellant") appeals his convictions and sentences for five counts of molestation of a child; four counts of furnishing harmful items to minors; three counts of sexual conduct with a minor; two counts each of attempted molestation of a child and child abuse; and one count each of sexual abuse, attempted sexual conduct with a minor, indecent exposure, and aggravated assault.  Appellant argues the trial court erred when it revoked his waiver of counsel, when it admitted the prior consistent statements of one of the victims, when it ordered two of his sentences to run consecutively to other sentences, and when it amended count 3 of the indictment.  For the following reasons, we vacate Appellant's conviction and sentence for sexual abuse as charged in the amended count 3 and affirm the remainder of Appellant's convictions and sentences.  We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A) (2016), 13-4031 (2010) and 13-4033 (2010).

## FACTS AND PROCEDURAL HISTORY

¶2          The State charged Appellant with twenty-six counts that alleged a variety of sexual offenses, obscenity offenses, child abuse, and aggravated assault.  Appellant committed the offenses against three minor victims.  Victims CJ and HJ were Appellant's biological daughters; victim ZR was Appellant's niece.[1]

¶3          At the conclusion of the State's case, the trial court granted Appellant's motion for judgment of acquittal on three counts that alleged sexual conduct with a minor, aggravated assault, and attempted public sexual indecency to a minor.  The jury acquitted Appellant of three counts that alleged aggravated assault, sexual exploitation of a minor, and public

_____

[1]      We use victim identifiers to protect the victims' identities.  Ariz. R. Sup. Ct. 111(i).

sexual indecency. The jury convicted Appellant of the remaining counts and the trial court sentenced him to an aggregate term of 114 years' imprisonment.

## ANALYSIS

### I. The Revocation of Appellant's Waiver of Counsel

¶4 More than a year before trial began, the trial court granted Appellant's motion to waive counsel and represent himself.[2] Just over six months later, the trial court revoked Appellant's waiver over Appellant's objection and appointed counsel to represent Appellant for the remainder of the proceedings. Appellant argues the trial court erred when it revoked his waiver of counsel.

#### A. Facts

¶5 The first attorney to appear in the record on Appellant's behalf was appointed counsel Flores.[3] Appellant raised numerous complaints about Flores and Flores's investigator shortly after the appointment of Flores. Among Appellant's complaints was that he did not know what was happening in his case because Flores would not communicate with him. Appellant conceded he had a prior attorney, attorney Harrison, with whom he did not get along, either.[4] Appellant moved to waive counsel and represent himself. Flores informed the court he could not communicate with Appellant because Appellant refused to speak to him. The trial court appointed attorney Cutrer to represent Appellant.

¶6 At the next case management conference, Appellant raised complaints about Cutrer. Appellant again complained he did not know what was happening in his case. He also claimed he did not have copies of all discovery and filings despite Cutrer's assurances to the contrary. Cutrer informed the court that, despite Appellant's claims about lack of communication, he had discussions with Appellant that lasted hours, he

---

[2] A different judge ultimately presided over Appellant's trial.

[3] Attorney Flores was Appellant's advisory counsel before being appointed as his counsel.

[4] No attorney named Harrison appears in the record on appeal.

sometimes talked to Appellant three to four times a day by telephone, and Appellant simply refused to believe anything Cutrer told him.

¶7            Several months later, Appellant again complained about Cutrer during a hearing and claimed Cutrer no longer represented him because Appellant had filed a request for a new attorney. The trial court denied Appellant's request for new counsel. Appellant then filed a notice that he was unable to proceed with Cutrer, which in essence was to request the court to remove Cutrer. When the court considered the notice, Appellant claimed once again that he did not know what was going on with his case. The court denied Appellant's request.

¶8            Appellant later filed another motion to change counsel, which the court denied. One week later, Appellant filed a handwritten waiver of counsel. At the next pretrial management conference, Appellant argued Cutrer no longer represented him because he filed the waiver. Cutrer, however, announced ready for trial. Appellant then claimed he did not wish to waive counsel, but wanted new counsel. Cutrer informed the court that Appellant had refused to see him the last three times he had gone to the jail to meet with Appellant. The court took no action.

¶9            At the next pretrial management conference in January 2014, Cutrer again announced he was ready for trial. Appellant, however, moved to represent himself. During the discussion of Appellant's motion, the court found no basis for Appellant's claims that Cutrer's representation was inadequate or that Cutrer had refused to work with Appellant. The court, however, granted Appellant's motion to represent himself but appointed Cutrer, over Appellant's objection, as advisory counsel. One month later, the court denied Appellant's motion to change advisory counsel. The court also continued the trial at the request of both Appellant and the State.

¶10            At the next pretrial management conference, Appellant stated he needed time to meet with his defense witnesses personally at the jail. When the trial court explained his witnesses could simply come visit him, Appellant claimed the visits had to be "special legal visits" so they could take place in a "special room." Appellant then claimed he had already spoken to the defense witnesses and they were available for interview by the State. When Cutrer clarified for the court that Appellant's investigator had already interviewed the defense witnesses and prepared summaries of the interviews, Appellant argued he had to meet with the witnesses personally to confirm his investigator's summaries of their interviews were correct. Appellant then moved for a continuance to interview his witnesses, obtain an expert to rebut the State's expert, and get a different investigator.

The trial court continued the matter for ninety days and noted the continuance should provide more than enough time for Appellant to be ready for trial. Appellant then argued he had a conflict with Cutrer and claimed Cutrer knew nothing about his case, even though Cutrer had announced ready for trial twice.

¶11        At a hearing a month later, the State informed the court Appellant had disclosed four adult witnesses and two minor witnesses. The State explained it had arranged interviews with these witnesses, but the witnesses subsequently refused to be interviewed unless Appellant was also present. The State was amenable to interviewing the adult witnesses in the jail so Appellant could be present, but the jail would not allow minors in the part of the facility where interviews could take place. The trial court indicated it would address the matter at the next conference.

¶12        At the next conference, Appellant argued the State must disclose all of its discovery once again because there were items missing from the State's disclosure. When pressed by the court, Appellant could, however, identify only one missing item—the signature page for the State's allegation of multiple offenses not committed on the same occasion. When the discussion turned to ways to arrange the interviews of Appellant's minor witnesses so Appellant could be present, Appellant objected to Cutrer's participation in the discussion. Appellant then complained again that he wanted to meet with his witnesses personally to "verify" what his own witnesses told his own investigator, but he refused to do so pursuant to the normal jail policies and procedures. The trial court correctly noted that, as Appellant represented himself, this was something he would need to figure out on his own.

¶13        A week later, Appellant informed the court and the State that he had obtained sworn statements from his witnesses, and that he planned to disclose only those portions of the statements he believed were relevant. The court explained the fallacy in Appellant's plan. Appellant once again claimed he wanted to meet with his own witnesses to verify whether the information in his own investigator's summaries of the witness interviews was correct.

¶14        The State noted Appellant's witnesses now refused to be interviewed by the State until they talked to Appellant first. The court found Appellant's four adult witnesses had refused to cooperate. The court ordered the parties to interview those witnesses within three weeks, regardless of whether the witnesses talked to Appellant first, and threatened their exclusion if the parties did not meet that deadline. When

the court and parties discussed the possibility of telephonic interviews with Appellant's two minor witnesses, Appellant argued he had to be personally present with the witnesses. The trial court reminded Appellant that the jail would not permit minors in the facility for interviews and such limitations were the reality of being in custody. When Cutrer suggested methods to interview Appellant's minor witnesses through videoconferencing, Appellant said he would refuse to participate and again complained he had a conflict with Cutrer. Appellant then claimed he had to be personally present because he did not have an investigator. The court reminded Appellant he did have an investigator at one time, and had requested another investigator but then withdrew that request. The court asked Appellant if he wanted another investigator and Appellant said no.

¶15        When the trial court then reminded Appellant he was going to trial in two months, Appellant suddenly claimed he had more unidentified "eyewitnesses" he needed to locate and interview. When the court again asked Appellant if he wanted an investigator, Appellant responded he did not know if he needed an investigator because the Office of Public Defender Services had an investigator to assign to him as soon as he let them know what he needed. Appellant offered no explanation for why he had not used the services of the investigator to that point. Regardless, this was in direct contradiction to Appellant's claim moments before that he had no investigator. Appellant then again complained about Cutrer and argued they had a conflict. The court noted no one but Appellant recognized any conflict. When the court asked Appellant if there was some new conflict with Cutrer or if it was the same purported conflict, Appellant refused to answer.

¶16        In an effort to aid the court, Cutrer explained that, despite Appellant's claims, Appellant had an investigator who conducted interviews of Appellant's earlier witnesses. Appellant responded that the person Cutrer was referring to was not his investigator because he did not ask for that specific investigator but wanted someone else. The court noted Appellant did not object to the investigator. The court finally ordered the State to interview Appellant's minor witnesses through videoconferencing. The court found Appellant's refusal to participate in a videoconference unreasonable and noted it is routine for investigators to interview witnesses without lawyers present at all. In direct contradiction to his numerous claims that he must be and wanted to be personally present for the interviews of his witnesses, as well as his claims that he did not have, did not want, or did not know whether he needed an investigator, Appellant then claimed he had been trying to do the witness interviews through an investigator all along. Further, despite just telling the court he did not have

an investigator and did not know if he needed an investigator, Appellant then claimed not only that he had a new investigator he wanted to use, but had spoken to the new investigator "at length." Appellant then claimed he had "put it on hold until [he] could find out what was going on here in the hearing." Appellant did not explain what, exactly, it was he had to find out that caused him to delay obtaining the investigator and moving forward with his preparation for trial. Regardless, the court once again asked Appellant if he wanted an investigator, and this time Appellant answered he did.

¶17        By the time of the next pretrial management conference a month later, the parties had failed to interview any of Appellant's witnesses, but through no fault of Appellant. When Cutrer informed the court that Appellant no longer wished to participate in any interviews of his witnesses, Appellant contradicted this and claimed he did want to participate. Appellant also noted he had identified two new witnesses.

¶18        Appellant then argued he needed even more time to complete his investigation. He claimed his investigator may have identified more "eyewitnesses" and he needed at least another month to locate and interview those witnesses. Appellant then claimed he needed experts on forensic interviews and child psychology. For the first time in the proceedings, Appellant also indicated he now wanted to interview some of the State's witnesses. When the court asked which specific witnesses Appellant wanted to interview, Appellant identified one person but refused to name any others "until I'm clear on the questions we're going to be asked [sic]." Whether the trial court or the State comprehended what Appellant meant is not reflected in the record, and Appellant did not elaborate further. Appellant then again claimed he had two additional "very important" witnesses who were "possibly eyewitnesses" he might identify once he was able to "get it clear" with his investigator. He did not, however, explain what he had to "get clear." Appellant also said he wanted to interview the investigating police officers, but did not know which ones.

¶19        When Appellant was done, the trial court remarked, "this could never end." The State remarked it had no idea what Appellant was talking about. Appellant again argued he could not be ready for trial. When the court twice asked Appellant if he was moving for a continuance, Appellant would not answer the court directly. He eventually claimed he and the State had informally discussed a continuance. The court held Appellant was making an oral motion to continue and granted the motion. The court noted it would be the sixth continuance since the original trial setting, something the court found "extraordinary" in its experience.

¶20            By the next pretrial management conference, the State had not yet interviewed Appellant's witnesses due to a misunderstanding by a new prosecutor.   The State noted Jones had never provided any contact information for any of his witnesses, so the State could not arrange interviews anyway.[5]   Either ignoring or unaware of the disclosure requirements of Arizona Rule of Criminal Procedure 15.2, Appellant responded that nobody had told him to provide contact information for his witnesses.

¶21            The trial court noted that, over the five months Appellant had represented himself, the case had not moved forward, admittedly for reasons that were not all related to Appellant.   Appellant claimed the fact he had done nothing more than obtain a few statements from his own witnesses over that period constituted progress.   The court disagreed and stated, "This has been a disaster."   The court had never had a *pro se* defendant who took so long to prepare for trial.

¶22            Appellant then argued the only reason he had not waived his right to self-representation and proceeded with appointed counsel was that he did not want Cutrer to represent him at trial.   Appellant had taken the same position in his previous case management memorandum to the court. In the end, the trial court removed Cutrer as advisory counsel and appointed new counsel to represent Appellant.   Despite Appellant having just told the court the only reason he had not waived his right to self-representation was because he did not want Cutrer as his attorney, Appellant told the court he wanted to continue to represent himself with new advisory counsel "so I can finish doing what I've done here."  The court declined to let Appellant continue to represent himself.   The court stated, "This has been a very unsuccessful experiment in terms of you representing yourself."   The court noted Appellant had limitations due to his custody, was at odds with an investigator he personally requested, had more than one advisory counsel, the situation was "unproductive," and the case was going nowhere.   The court believed the case would not move forward unless Appellant was represented by counsel.    Trial then started approximately nine months after new counsel was appointed to represent Appellant.

¶23            Even after the court appointed counsel, Appellant did little or nothing to help move his case forward.   When the State rested its case,

---

[5]      The State arranged the previously-cancelled interviews through direct contact with the witnesses at the courthouse after a hearing the witnesses attended.

Appellant refused to tell his trial counsel whether he would testify. When the court questioned Appellant about this, Appellant claimed he wanted to testify, but it was not in his best interest because his counsel's representation was "illegitimate." Appellant further stated, "I also reiterate my standing objection to even holding this trial with the convictions are serious in this case [sic]. I object to the state proceeding and the court proceeding in this case when knowing such conflict [sic]." The court responded, "I have no idea what you are talking about." Appellant then made the same claims he had made about every attorney who had represented him. Appellant argued there was a conflict with his trial counsel, and that his trial counsel had never spoken to him about the case and knew nothing about the case. Appellant's counsel explained that, despite Appellant's claims, she attempted to communicate with Appellant but he refused to cooperate. Counsel asserted having had many telephone conversations with Appellant, many of which ended with Appellant "yelling" and "screaming" at her and hanging up. Other times, Appellant refused to take the counsel's calls. Appellant sometimes called his counsel's office and then refused to speak. Counsel further noted Appellant had refused to meet with her or her investigator on several occasions. When Appellant did meet with her, he would sometimes refuse to speak other than to say he did not acknowledge her as his attorney. Appellant's counsel also noted it had become necessary to have another person present on those occasions when Appellant would agree to meet with her. Finally, Appellant's counsel explained Appellant would not even speak to her in the privacy of a courthouse conference room, and every time she asked Appellant if he had any questions during trial, he would respond "I'm not speaking to you, you're not my attorney."

### B.     The Merits

¶24     Appellant argues the trial court erred when it revoked his waiver of counsel and appointed counsel to represent him for the remainder of the proceedings. Appellant claims he followed the rules and the court's orders as best as he could under the circumstances and tried to get ready for trial, but could not because he did not get any help from his advisory counsel or the Office of Public Defender Services. He further argues the trial court could not terminate his self-representation simply because being in custody made it difficult for Appellant to represent himself.

¶25     A defendant has a constitutional right to waive counsel and represent himself or herself. *State v. Moody*, 192 Ariz. 505, 509, ¶ 22, 968 P.2d 578, 582 (1998). This right, however, does not exist in a vacuum. *State*

*v. De Nistor*, 143 Ariz. 407, 412, 694 P.2d 237, 242 (1985). The right to self-representation is balanced against "the government's right to a 'fair trial conducted in a judicious, orderly fashion.'" *Id.* A self-represented defendant still must comply with the rules of procedure, substantive law, and courtroom protocol. *State v. Gomez*, 231 Ariz. 219, 222–223, ¶¶ 8, 15, 293 P.3d 495, 498–99 (2012); *State v. Whalen*, 192 Ariz. 103, 106, 961 P.2d 1051, 1054 (App. 1997). This includes compliance with deadlines and the rules of disclosure. *Gomez*, 231 Ariz. at 223, ¶ 16, 961 P.2d at 499. A trial court may revoke a defendant's waiver of counsel and appoint counsel when the defendant's self-representation will "undermine the court's authority and ability to conduct the proceeding in an efficient and orderly manner." *Id.* at 223–24, ¶ 16, 961 P.2d at 499–500. We review the decision to revoke a waiver of counsel for abuse of discretion. *Id.* at 222, ¶ 8, 293 P.3d at 498.

**¶26** The trial court did not abuse its discretion when it revoked Appellant's waiver of counsel and appointed counsel to represent him throughout the remainder of the proceedings. Appellant's actions and inactions addressed above clearly indicate that, so long as he represented himself, the proceedings would not move forward, let alone move forward in an efficient, judicious, and orderly manner.

**¶27** Appellant's conduct while he was self-represented was dilatory and did little or nothing to advance the proceedings and largely hindered the advancement of the proceedings. Appellant refused to take advantage of the availability of advisory counsel to help prepare for trial and demonstrated a lack of candor when he repeatedly told the court that all of his counsel, advisory and otherwise, would not communicate with, or otherwise assist, him. He also refused to take full advantage of the availability of investigators to assist him and repeatedly changed his story regarding his use of investigators and whether he had, wanted, or needed an investigator. Further, every time the court or anyone else made a valid suggestion to Appellant about what he could do to proceed with his investigation and trial preparation, Appellant either simply did nothing, or came up with an excuse for why it was not satisfactory and refused to do it. As a result, Appellant did virtually nothing to move forward with his preparation. Even he conceded at trial that his total "progress" over the course of nearly five months of self-representation was to do nothing more

than obtain statements from some of his own six witnesses, none of whom actually testified at trial.[6]

¶28        Further, the record establishes Appellant would always have an excuse for why he needed more time.  Whenever it became apparent the court might not grant another continuance or might not otherwise give him additional time to complete a task, Appellant would offer new excuses for why he needed more time, such as the need to locate and interview more new witnesses and obtain expert witnesses.  Finally, Appellant contradicted himself so frequently, apparently, and thoroughly within his explanations and protestations to the trial court that the court had no reason to believe Appellant would ever be ready for trial, let alone believe the case would move forward in an efficient, judicious, and orderly manner.  This is made readily apparent by Appellant's last act as a *pro se* litigant.  As noted above, Appellant eventually argued the only reason he had not waived his right to self-representation was that he did not want advisory counsel Cutrer to represent him at trial.  The trial court granted Appellant's wish, removed Cutrer as advisory counsel, and appointed new counsel.  In his next breath, Appellant took a position opposite to that he had just espoused and claimed he wanted to continue to represent himself.  The trial court did not abuse its discretion when it revoked Appellant's waiver of counsel under these circumstances.[7]

### II.     Admission of Victim HJ's Prior Statements

¶29        Appellant argues the trial court erred when it admitted the prior consistent statements of victim HJ through the testimony of another witness.  Appellant argues the testimony was inadmissible hearsay.

---

[6]        Trial counsel investigated all of Appellant's proffered witnesses and chose not to call them to testify for tactical reasons.

[7]        While these are not the identical reasons the trial court relied on to make its ruling, we may affirm on any basis the record supports.  *State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987).  This includes when a trial court revokes a waiver of counsel and the record supports the revocation for reasons the trial court did not rely on.  *State v. Doss*, 116 Ariz. 156, 160, 568 P.2d 1054, 1058 (1977); *State v. Martin*, 102 Ariz. 142, 146, 426 P.2d 639, 643 (1967).

*A.      Facts*

**¶30**      HJ was twelve years old at the time of trial.  During cross-examination, Appellant asked HJ if she saw victim CJ frequently, if she spoke to CJ on the phone frequently, and if her mother and CJ's mother talked to each other.  HJ also admitted on cross-examination that she had told her mother she did not want to go to Appellant's home anymore because he was boring, rather than because of inappropriate contact.  Appellant also got HJ to admit she did not tell her mother or CJ about any of Appellant's conduct.  Finally, Appellant asked HJ if she had spoken to prosecutors, law enforcement investigators, or medical providers at times other than those to which she had admitted.  The State noted HJ had a difficult time testifying and was not always responsive.  Appellant later agreed "it was like pulling teeth."  The trial court also noted HJ was "extremely hesitant.  It was very laborious trying to get any testimony from her."

**¶31**      Following this cross-examination, the State sought to admit HJ's prior consistent statements through the testimony of the woman ("SW"), to whom HJ first disclosed the incidents.  The State argued in relevant part that Appellant's cross-examination of HJ implied HJ fabricated the incidents and had colluded with others regarding her testimony.  Appellant objected, and argued HJ's prior statements were hearsay and that he had not implied HJ fabricated her testimony but had simply asked questions relevant to disclosure.

**¶32**      The trial court held that, while Appellant may not have intended to imply HJ was fabricating testimony, Appellant's cross-examination of HJ could have led the jurors to believe Appellant implied HJ recently fabricated her story or that other people improperly influenced her testimony.  The court held HJ's prior consistent statements were admissible pursuant to the then recently-amended Arizona Rule of Evidence 801(d)(1)(B).  In a supplemental ruling, the court further explained the manner in which HJ testified was a factor in its decision to admit the evidence.  The court explained it was "very difficult" for HJ to answer any questions and "it took her about a minute each time a question was asked to even answer. If not a minute several, several seconds. In other words, extremely long pauses with every question and every answer and it got to the point where after a[ ]while, [the S]tate asked to take a break because clearly the victim was having a lot of difficulty testifying.  So I thought the record should be supplemented. That is what I observed." SW ultimately testified in relevant part that HJ disclosed incidents to her in

which HJ claimed Appellant touched her vagina with his fingers and a sexual device and digitally penetrated her while she was in a bathtub.

### B. The Merits

**¶33** We review a trial court's evidentiary rulings for a clear abuse of discretion. *State v. Amaya-Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990). Rule 801(d)(1)(B) provides in relevant part that a declarant's prior statement is not hearsay if the declarant testifies and is subject to cross-examination about the statement and the statement is consistent with the declarant's testimony. The rule further requires the statement be offered to either (1) rebut an express or implied claim that the declarant recently fabricated the statement or the testimony was a result of improper influence or motive, or (2) to rehabilitate the declarant's credibility after it has been attacked on another ground. Ariz. R. Evid. 801(d)(1)(B).[8]

**¶34** The trial court did not abuse its discretion when it admitted HJ's prior statements because the statements were not hearsay pursuant to Rule 801(d)(1)(B). HJ testified at trial and was subject to cross-examination. Her prior statements were consistent with her testimony. A reasonable juror could find that Appellant's cross-examination of HJ implied she and CJ may have discussed HJ's allegations or her future testimony, and HJ may have been aware her mother and CJ's mother may have discussed their daughters' allegations. A reasonable juror could also find Appellant's cross-examination of HJ implied she was not telling the truth because she did not disclose the incidents to her mother and told her mother she did not want to go to Appellant's house because he was boring. Finally, a reasonable juror could find Appellant's cross-examination about HJ's contacts with other people about the incidents implied HJ met with prosecutors, investigators, and medical providers more times than she admitted. Therefore, the trial court could admit HJ's prior consistent statements as non-hearsay to rebut implied claims that HJ fabricated her testimony and her testimony was the result of improper influence or motive, and to rehabilitate HJ's credibility after Appellant attacked it.

---

[8] The declarant must also have made the prior consistent statement before the motive to fabricate arose. *State v. Jones*, 187 Ariz. 290, 299, ¶ 14, 4 P.3d 345, 354 (2000). Appellant raises no issue regarding the timing of the motive to fabricate.

### III.  *The Imposition of Consecutive Sentences*

**¶35**       The trial court imposed a mix of concurrent and consecutive sentences in which the five-year sentence for sexual abuse as charged in count 8 would run consecutively to the seventeen-year sentence for molestation of a child as charged in count 1.  The twenty-year sentence for sexual conduct with a minor as charged in count 7 would run consecutively to the seventeen-year sentence for molestation of a child as alleged in count 4.  Appellant argues the trial court erred when it ordered count 8 to run consecutively to count 1 because the two counts were based on the "exact same act at the exact same time against the exact same victim."  He further argues the court erred when it ordered count 7 to run consecutively to count 4 because they also involved "the exact same conduct with the exact same victim."

**¶36**       "An act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent."  A.R.S. § 13-116 (2010).  "We review *de novo* whether consecutive sentences are permissible under § 13-116."  *State v. Siddle*, 202 Ariz. 512, 517, ¶ 16, 47 P.3d 1150, 1155 (App. 2002).  While Appellant raised no objections to his sentences with the trial court, "[i]mposition of an illegal sentence constitutes fundamental error."  *State v. Thues*, 203 Ariz. 339, 340, ¶ 4, 54 P.3d 368, 369 (App. 2002).  Therefore, we may reverse an illegal sentence even in the absence of an objection.  *State v. Canion*, 199 Ariz. 227, 230, ¶ 10, 16 P.3d 788, 791 (App. 2000).

**¶37**       We find no error.  We need not address whether counts 1 and 8, or counts 4 and 7, were based on the same acts, however, because A.R.S. § 13-116 does not control where A.R.S. § 13-705(M) is dispositive.  All four of the offenses were dangerous crimes against children.  A.R.S. § 13-705(M) provides in relevant part that any sentence "for [a] dangerous crime against children in the first or second degree shall be consecutive to any other sentence imposed on the person at any time, including child molestation and sexual abuse of the same victim."  A.R.S. § 13-705(M) (Supp. 2015).[9] Our supreme court has held the more specific sentencing provisions of § 13-705(M) govern over the general provisions of § 13-116 even when the convictions arise from a single act.  *State v. Jones*, 235 Ariz. 501, 502, ¶ 1, 334

---

[9]       The two exceptions—established within § 13-705(M) allowing a crime involving child molestation pursuant to § 13-705(D) or sexual abuse pursuant to § 13-705(F) to be served concurrently with other sentences if the offense involved only one victim—do not apply here.  A.R.S. § 13-705(M).

P.3d 191, 192 (2014). Therefore, the trial court was required to order the sentence for count 8 to run consecutively to the sentence for count 1, and the sentence for count 7 to run consecutively to the sentence for count 4.

### IV. *Amendment of the Indictment*

**¶38** As the final issue on appeal, Appellant argues the trial court erred when it amended count 3 of the indictment to change the offense from molestation of a child to sexual abuse.

#### A. *Facts*

**¶39** Count 3 originally alleged Appellant committed molestation of a child when he engaged in digital-vaginal contact with CJ "while playing doctor." *See* A.R.S. § 13-1410(A) (2010) (defining molestation of a child). CJ testified, however, Appellant would feel her chest and stomach when they played doctor. She never testified to any digital-vaginal contact engaged in when they played doctor. Appellant's cross-examination regarding this count's underlying factual allegations was limited to whether Appellant put his hand under CJ's clothing when they played doctor.

**¶40** When the State rested, Appellant moved for a judgment of acquittal on count 3 and argued there was no evidence of digital-vaginal contact. The State moved to amend count 3 to allege a wholly-new charge of sexual abuse based on Appellant touching CJ's breasts. *See* A.R.S. § 13-1404(A) (Supp. 2015) (defining sexual abuse). The court amended the indictment, over Appellant's objection, finding it could amend the indictment to conform to the evidence pursuant to Arizona Rule of Criminal Procedure 13.5(b).

#### B. *The Merits*

**¶41** Rule 13.5(b) provides "[t]he charging document shall be deemed amended to conform to the evidence adduced at any court proceeding." Ariz. R. Crim. P. 13.5(b). The rule itself limits this, however, "to correct mistakes of fact or remedy formal or technical defects." *Id.*; *accord State v. Freeney*, 223 Ariz. 110, 113, ¶ 18, 219 P.3d 1039, 1042 (2009); *accord State v. Johnson*, 198 Ariz. 245, 247, ¶ 5, 8 P.3d 1159, 1161 (App. 2000). Further, "A defect may be considered formal or technical when its amendment does not operate to change the nature of the offense charged or to prejudice the defendant in any way." *State v. Bruce*, 125 Ariz. 421, 423, 610 P.2d 55, 57 (1980). When an amendment changes the elements of the charged offense, the amendment changes the nature of the offense. *Freeney*,

223 Ariz. at 113, ¶ 17, 219 P.3d at 1042. Therefore, absent a defendant's consent, *Freeney* directs that a trial court may not amend an indictment pursuant to Rule 13.5(b) if the indictment does not contain a mistake of fact or a formal or technical defect, nor may a court amend an indictment if it changes the nature of the charged offense. *Id.* at ¶ 20.

**¶42** Count 3 contained no mistake of fact or formal or technical defect. Count 3 simply alleged a charge that the State later failed to prove. Any mistake or defect was in the State's case, not count 3 of the indictment. The amendment also changed the nature of the offense. Molestation of a child and sexual abuse are separate and distinct crimes with different elements, and sexual abuse is not an otherwise lesser included offense of molestation of a child. *State v. Cousin*, 136 Ariz. 83, 86, 664 P.3d 233, 236 (App. 1983).

**¶43** The State concedes error but argues the error was harmless. *See Freeney*, 223 Ariz. at 114, ¶ 26, 219 P.3d at 1043 (noting a Rule 13.5(b) violation may be harmless). The State, however, has not shown the error was harmless under these circumstances. Appellant had no notice of the amended charge or the conduct that constituted the basis of the amended charge. He had no reason to develop any meaningful cross-examination of CJ regarding her allegations of what occurred when she and Appellant "played doctor" because the State did not charge Appellant for the conduct CJ identified and CJ failed to provide any testimony to support count 3 as originally charged. Appellant had every incentive to not probe further on cross-examination and simply move the court to grant a judgment of acquittal on count 3. For Appellant to do something otherwise on cross-examination might result in the admission of evidence that would prove count 3 as originally charged, whether through additional recollection by CJ or giving the State the opportunity and incentive to try to admit the missing evidence during redirect examination. Because the State has not shown the error was harmless, we vacate Appellant's conviction for count 3.

## CONCLUSION

¶**44** For the reasons stated above, we vacate Appellant's conviction and sentence for sexual abuse as charged in the amended count 3 of the indictment. We affirm the remainder of Appellant's convictions and sentences.



Amy M. Wood • Clerk of the court
FILED: AA