

FILED

Oct 30 2018, 6:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael J. Love,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | October 30, 2018<br><br>Court of Appeals Case No.<br>49A04-1712-CR-2971<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Lisa F. Borges,<br>Judge<br><br>Trial Court Cause No.<br>49G04-1507-F1-25786 |

**Altice, Judge.**

## Case Summary

[1] Michael Love was charged with two counts of attempted murder. For a period of time, Love was represented by either a public defender or private counsel.

Eventually, however, Love requested and was granted permission to proceed pro se, and he did so for over ten months. At a hearing just days before Love's jury trial was set to begin, the trial court terminated his self-representation and, over Love's objection, directed Love's public defender, whom the trial court had appointed as standby counsel, to represent Love at the upcoming jury trial. The jury found Love guilty as charged, and the trial court subsequently sentenced Love to consecutive terms of forty years. On appeal, Love argues that he was improperly denied his constitutional right to represent himself.

[2] We affirm.[1]

## Facts & Procedural History

### *Underlying Crime*

[3] Love and Sultanna Reed dated and lived together for about three years, during which time they had one child together. Reed also had two other children from prior relationships. After Love and Reed's relationship ended in April of 2015, Reed and her three children moved in with Reed's brother, Zachariah Guyton, and his girlfriend, Becky Smith, and their three young children. At that time, Reed's children were around ages twelve, three, and one.

---

[1] We held oral argument at Rossville High School on October 4, 2018. We commend counsel for their excellent written and oral presentations. We also thank the staff and students for their hospitality.

[4] Around 9:00 a.m. on July 20, 2015, Reed, Guyton, Smith, and five of the children made their way out of the house and across the street to Smith's car. Smith got into the vehicle as Reed and Guyton approached the car with the children. All three adults noticed what appeared to be an old lady walking toward them on the sidewalk about a house or two away. Guyton testified that "[i]t didn't look like your typical old lady."[2] *Transcript Vol. II* at 116. The individual was collectively described as "bigger built," wearing a curly, blonde wig, some type of mask, a brown floral dress, stockings, Velcro black shoes, and gloves. *Id*. at 136. The individual carried a grocery bag and had a limp.

[5] As the individual approached, Reed recognized that it was Love wearing a disguise, and Smith overheard Reed say to him, "I knew that was you." *Id*. at 137. Reed quickly put her and Love's child in the car. As Love got closer, he drew a gun from the bag and, at close range, fired several shots at Reed, with one striking her in the arm and two in the abdomen/chest area. Guyton put his youngest child in the car and yelled at the other children to get down. He then walked around the vehicle to help Reed and ended up face to face with the shooter, whom, at that moment, he recognized as Love because the mask Love was wearing had fallen exposing part of his face. From about six feet away, Love shot Guyton in the face, under his right eye.

---

[2] Guyton explained, "It didn't look like an elderly lady. It looked like somebody trying to be Madea coming down the street." *Transcript Vol. II* at 116.

[6] Love fled from the scene down an alley. Upon hearing the gunfire, a neighbor looked out her window and saw someone she believed to be a man "hobbling down the street" away from the shooting. *Id*. at 179. Smith testified that she saw the shooter turn and "run" down an alley. *Id*. at 140. Cory Latham was working at a nearby car dealer and heard the gunfire. When he looked up, he saw a person he believed to be a man "at a fast pace walking" across the alley. *Id*. at 158. Latham recalled that the person was wearing a wig and some sort of gown, but believed the person was a man because of the person's "[m]uscular" calves. *Id*. Latham then saw a black car "kind of speeding off" down the street, away from the alley. *Id*. at 160.

[7] Police responded to the scene. As one of the officers drove past the car dealer, Latham flagged the officer down and told him what he had seen. That officer searched the immediate area but did not locate a black car. In the meantime, Guyton told other responding officers what had occurred and identified Love as the shooter. Officers went to Love's address shortly after 10:00 a.m., and around 10:30 a.m., Love arrived driving a black vehicle and in the company of a woman named Lashonna Brown. Love was arrested and taken into custody.

[8] On July 22, 2015, the State charged Love with two counts of attempted murder as Level 1 felonies. At his initial hearing, the trial court appointed a public defender to represent Love. On March 31, 2016, Love filed a pro se motion to dismiss his public defender. The trial court did not rule on this motion because Love hired private counsel who entered an appearance on his behalf on April 12, 2016. Love's private counsel represented him until October 5, 2016, when

the trial court granted him leave to withdraw because of Love's unfulfilled financial obligations. That same day, the trial court re-appointed Love's original public defender. At that time, Love's jury trial was set to begin on January 9, 2017.

[9] On November 30, 2016, a week before a final pretrial conference, Love filed a motion requesting to proceed pro se. Love alleged that his public defender had provided inadequate representation in that his public defender was indifferent to his pain and suffering and the neglect of his medical condition by the jail. Love also claimed that his public defender had tried to "blackmail" him into accepting a plea offer. *Appellant's Appendix Vol. II* at 195. At a December 7, 2016 hearing, the trial court granted Love's request, but appointed Love's public defender as standby counsel. Love informed the court that he would not be ready to go to trial in January, so the court continued the jury trial until March 2017. The jury trial was reset for May 22, 2017, then again to August 21, 2017, and finally to October 30, 2017. Love represented himself until October 27, 2017, when the trial court determined that Love was "not physically in a condition to represent [him]self." *Transcript Vol. II* at 73.

*Love's Medical Condition*

[10] Before Love's arrest on July 20, 2015, his medical history included multiple gunshot wounds, chronic back and knee pain, gout, anxiety, and a urostomy along with a nephrostomy bag. His chronic pain was controlled by prescription medication.

[11]     Two days after his arrest, the trial court sent a medical inquiry to the jail stating that Love had indicated he was in extreme pain and needed to be seen by a doctor as soon as possible. On August 5, 2015, Love wrote a letter to the court asserting that the Marion County Jail was "not equipped to accomidate [sic] nor manage [his] ongoing complicated urological and surgical history and severe medical needs." *Appellant's Appendix Vol. V* at 241. Love believed it was "imperative he be released" so he could get proper medical care. *Id.*

[12]     In September and December 2015, Love, who remained in jail, had additional tubes placed on an outpatient basis. On April 14, 2016, Love submitted a jail healthcare request asking for pain medication for "excruciating pain" that he claimed stemmed from strangulated hernias, kidney stones, and his nephrostomy tubes. *Id.* at 238. He again claimed the jail was neglecting his condition by failing to flush his kidneys three times a day and by refusing to get him necessary surgeries. He also indicated that he was experiencing intestinal and renal incontinence with dark, bloody, and foul-smelling urine.

[13]     In May 2016, Love sent another letter to the trial court with dated entries detailing his continued complaints concerning his medical treatment while in jail. He again complained of ongoing pain that he attributed to internal bleeding, strangulated hernias, and kidney infections. He also claimed he was experiencing swelling in his eyes and aching in his ear, that his nephrostomy tubes and bags were leaking, and that he was experiencing migraine headaches from not receiving prescription medication to control the pain from a gunshot wound to his head in which the bullet had not been removed. Love requested

that he be released on his own recognizance so that he could obtain necessary medical care and surgeries at his own expense. He stated that given his medical issues and the pain he was experiencing, he could not effectively communicate with his attorney. He also alleged that jail and medical staff were discriminating against him and not providing him with adequate care.

[14] On June 19, June 30, July 15, and July 18, 2016, Love had kidney stone surgeries, the first two of which were unsuccessful. It also appears that medical staff wanted to remove his nephrostomy tube(s) in August of 2016, but that Love instead had a surgery in October 2016 that he described as "terrible." *Id.* at 231.

[15] On November 24 and 28, 2016, Love submitted jail healthcare requests for pain medication and he also mentioned that he was experiencing swelling and numbness of his legs, feet, ankles, and hands, and that his fingers were locking up. He also filed grievances alleging inadequate post-operative healthcare on November 8 and 9, 2016. In his November 8 grievance, Love mentioned "severe burning & stabbing . . . pains in [his] testicles, penis, and bladder," a constant urge to urinate, and frequent intestinal incontinence. *Id.* at 232. At a December 7, 2016 pretrial conference, Love informed the court about the swelling and numbness he was experiencing. On January 4, 2017, Love submitted a jail healthcare request mentioning he was urinating blood and that he had an infection. At a pretrial conference on May 16, 2017, Love moved for a continuance because he was in excruciating pain from a hernia. At an August

16, 2017 pretrial conference, Love informed the court that he had blood clots in his eyes.

*Love's Self-Representation*

[16] During the December 7, 2016 hearing on Love's request to proceed pro se, Love told the trial court he had represented himself in Los Angeles in the mid-1990s and for a traffic offense in Indianapolis in the early 2000s that was dismissed. Love also indicated that he had done the pretrial work for a 2008 case in Indianapolis but hired counsel to conduct the trial, which ultimately resulted in an acquittal. Love also informed the court that he had graduated from high school and had attended two years of college. The court warned Love that he could not be "abusive, disruptive, or threatening" to any jurors, witnesses, or other participants in the trial or the court would no longer let him represent himself, and Love stated that he understood. *Supplemental Transcript* at 43. After the trial court approved his request to proceed pro se, Love's first action was to request a continuance of the jury trial scheduled for January 2017. Over the State's objection, the trial court reset the jury trial for March 6, 2017.

[17] While representing himself, Love filed numerous motions, including motions to dismiss, specific discovery requests, a motion for recusal of the trial court judge, a praecipe for the determination of whether a ruling had been delayed beyond the Ind. Trial Rule 53.1 time limitation,[3] a notice of alibi, exhibit and witness

---

[3] The Indiana Supreme Court issued an order on this motion on July 20, 2017.

lists, motions to continue, motions to vacate portions of the trial court's ruling on the State's motion in limine, a motion for funds for an investigator, and notices of discovery noncompliance. With many of these filings, Love included memorandums and arguments containing relevant references to constitutional law, case law, trial rules, the Indiana Code, ABA standards, and a treatise. Love also presented oral argument with regard to many of the motions before the trial court.

[18] On February 15, 2017, the trial court held a final pretrial conference before the upcoming March trial date. During the hearing, the untimeliness of Love's most-recent notice of alibi was discussed. Love cast blame on his public defender and claimed that his constitutional rights were being violated, comments to which the trial court took exception. The court then addressed Love's request to continue the jury trial, which was based on Love's claims that he was not prepared to proceed because he had not had adequate access to the law library, his public defender had been dilatory in providing him with his case file, and the State had declined to fulfill his demand for specific discovery. The court stated: "I want the record to be clear discovery is not incomplete due to any fault of the State." *Supplemental Transcript* at 105. Over the State's objection, the trial court granted Love's request for a continuance, resetting the jury trial for May 22, 2017.

[19] Two days later, on February 17, 2017, the trial court received a letter from Love, wherein he moved to dismiss the case because his public defender had conspired against him by refusing to use his "current and past and ongoing

medical infirmaties [sic] and disabilities" to attack the credibility of the State's witnesses.[4] *Appellant's Appendix Vol. III* at 160. On March 6, 2017, Love filed a request for co-counsel "[b]ecause of the multitude of witnesses and the numerous items of evidence being compiled by the [S]tate." *Id.* at 203. Love took exception to his standby counsel, claiming standby counsel was ineffective and suggesting that perhaps "th[e] court [was] in the business of only appointing co-counsel to attorneys with law degrees and/or to colleagues who it favors." *Id.* at 203-04. The trial court denied Love's request.

[20]  At a pretrial conference on May 3, 2017, the trial court noted that it would rule on Love's motions to dismiss based on alleged misconduct of the State, various objections, and a request that the judge recuse prior to the start of trial. As of that hearing, Love had not yet filed his witness list. He also argued that his standby counsel had not secured copies of Love's own medical records. The trial court advised Love to talk with standby counsel and Love objected to "having this guy . . . the same public defender . . . who has pretty much sabotaged my defense from the beginning" and asked the court to appoint standby counsel who was not from the Public Defender's office. *Supplemental Transcript* at 129. Love also complained about his inability to sift through discovery as it was provided on electronic media. Love then indirectly inquired about continuing the jury trial set for May 22, 2017. After the trial court

---

[4] Specifically, Love wanted to use his medical and physical conditions to discount eyewitness statements that he was seen running/moving quickly away from the scene of the shooting.

reminded Love that he wanted that date and informed him that it would not be continued, Love requested another pretrial conference for May 16, 2017, but asked the trial court to ensure that a different judge would preside over the matter.

[21] On May 9, 2017, Love filed another request for co-counsel given the volume of evidence compiled by the State. At the May 16 pretrial conference, Love told the court that he was "[n]ot ready" for trial and needed more time to prepare. *Transcript Vol. II* at 4. Love also claimed he needed a continuance for medical reasons, explaining to the court that a hernia "popped up in [his] stomach last night." *Id*. at 5. Over the State's objection, the trial court continued the jury trial and sent an inquiry to the jail concerning Love's medical condition. A medical doctor with the jail responded that Love had "14 refusals of care over the last 2 years" and had "old abdominal wall hernias compatible with weakness in the abdominal wall from previous surgeries." *Appellant's Appendix Vol. IV* at 214.

[22] On May 19, 2017, the trial court denied all of Love's pending motions to dismiss, motions for specific discovery, and other requests. The court reset the jury trial for August 21, 2017, and set a deadline for any additional motions, which deadline the court stated would be "strictly enforced." *Id*. at 224. On May 26, 2017, Judge Carlisle recused herself from the case and the matter was transferred to Marion Superior Court No. 4. The pending final pretrial hearing and jury trial dates were vacated, and a new trial date was set for August 7, 2017. Upon Love's motion, the trial date was reset to September 11, 2017.

[23]     On August 3, 2017, Love filed a motion requesting that the trial be held as originally scheduled for August 7. Love explained:

> On 7/19/2017 . . . while Defendant was suffering and distracted from severe headaches and head trauma and eye pains with flickering and flashing images in his injured eye. Plus the pains and trauma in his right hand. As a result of such pains and traumas Defendant believes he may have requested a lengthy continuance which was not his intention to do. . . . The Defendant was not in his right state of being at the time. Wherefore when this event was done while under the duress of antagonizing traumas and pains it was carried out absent clear thinking.

*Appellant's Appendix Vol. V* at 139. In addition, Love stated that he could not "effectively and adequately advocate with [his] attorney and put up an adequate and effective defense with these major medical problems." *Id*. at 234. The trial court denied Love's request.

[24]     At an August 16, 2017 hearing, the State moved to continue the September 11 trial date due to the absence of one of its witnesses. Love objected, claiming that he was in a lot of pain and that he still had blood clots and that he needed to get the trial over with. Love agreed to a trial deposition of the unavailable witness, so the trial court denied the State's request for a continuance. Love then asked the court to order another medical evaluation and apparently lifted his shirt because the court directed him to "[c]over up [his] stomach." *Transcript Vol. II* at 18.

At an August 30, 2017 hearing, the court informed Love that it had to continue the September trial date due to a scheduling conflict. During this hearing, Love informed the trial court of his need to move around and change positions and that because of his hernia, he would have to lie down on the floor during trial. Love specifically asked if he could lie on the floor and still conduct his defense. The trial court told Love that he could not lie on the floor in front of the jury, but to accommodate his medical condition, the court would take a break about every two hours.

On September 27, 2017, Love filed a motion for immediate release because of claimed neglect of his medical condition by the jail. This motion was denied. Before setting a new trial date, the trial court inquired of standby counsel as to how much time he would need to prepare to ensure that he would be ready to step in if needed for the next scheduled trial date. The trial court reset the jury trial for October 30, 2017.

At a hearing on October 4, 2017, the court addressed Love's request that he be released on his own recognizance due to his medical issues, and the trial court explained that his medical condition was not going to get him out of jail and advised him to accept offered medical treatment. The court also informed Love that it had learned that he had been transported to Eskenazi Hospital for treatment of his medical conditions a total of eighteen times and that each time he refused treatment. Love took exception to the report of his denial of treatment, but then explained that he refused treatment because he believed the follow-up care at the jail was lacking. Love told the trial court that "[i]t would

be suicide to me to allow anymore procedures performed on me while I'm . . . under the fictitious care [of] the Marion County Sheriff's Department." *Id*. at 26.

[28] The trial court recognized Love was in pain and expressed its desire that Love accept medical treatment and get healthy prior to trial. The court warned: "I want to respect your ability to represent yourself. But should I determine that your health has interfered with your ability to represent yourself, I will be ordering [standby] counsel to take over the defense." *Id*. at 28. Love responded, "Well, my mind is intact. This is my body situation so that has nothing to do with my representing myself." *Id*. The trial court explained,

> Actually the two are connected. If you are in pain and are indicating you are in pain such that your presentation of yourself to the jury indicates that you are in pain, then in my estimation I will find that you are not in good enough shape to be conducting your own defense and will have [standby counsel] ordered to step in.

*Id*. at 28-29. Love objected to that occurring, accusing standby counsel of having "sabotaged" his defense and having set him up to be prosecuted by the State. *Id*. at 29.

[29] At the final pretrial conference on Friday, October 27, 2017, Love appeared in a wheelchair. During the hearing, the court emphasized to Love that the jury trial would proceed as scheduled on Monday and after explaining the voir dire process, the court noted on the record:

I see you wincing repeatedly here in front of me now. I know that you are seated in a wheelchair, that you are carrying various bags of urine. And I have also been told by the deputy that you are able to ambulate freely when you are in the jail. . . . [Y]ou can be in front of the jury in the wheelchair dressed out in what clothes that are brought for you that should be your size. Your comments may not be about your health. And if I see you looking as if you are at a point where you are not well, [standby counsel] will be taking over the representation.

*Id*. at 71. The following conversation between Love and the trial court ensued.

MR. LOVE: What point? What you mean when I make an ouch (indiscernible)?

THE COURT: Yes. If you are being disruptive because of your - -

MR. LOVE: I'm not being disruptive. That's part of my disability.

THE COURT: If you interrupt me like you are doing now, if you do this whole representation that you are in agony and having all kinds of problems with your health, if you do any of that in front of the jury you will be – go back to the, relax back in lockup and [standby counsel] will take over in representing you.

MR. LOVE: But I'm going to object to that.

THE COURT: So this means you will forfeit your ability to be in front of the jurors. Okay. I want to make that very clear.

MR. LOVE: So you're discriminating against my disability?

THE COURT: Yes, I am. At the point where you are not going to be allowed to use it to gain sympathy in front of the jury.

MR. LOVE: I'm not using my disability to gain no sympathy. This is fact.

THE COURT: Right. Because you are not going to be allowed to do [i]t.

MR. LOVE: This is real.

*Id*. at 71-72. Moments later, the trial court stated: "Record reflect [Love] is waiving his urine bag in the air around his wheelchair, winching [sic] and grasping at his belly, grasping and bending and groaning audibly, for the record." *Id*. at 73. Love responded, "Yeah. And that's part of my disabilities for the record. . . . That's my pains. . . . My pain is for real." *Id*. The court agreed with Love's statement, but continued: "And I think you are not physically in a condition to represent yourself and I am now appointing [standby counsel" to take over." *Id*. Love objected, demanded to represent himself, and accused the trial court of setting him up. The trial court told Love that he was being rude and disrespectful and admonished him that if he behaved that way during trial, he would be removed. The trial court stated for the record: "Just make sure the minutes show the Court finds the Defendant['s] behavior is so that he is unable to effectively represent himself." *Id*. at 74. The trial court then appointed Love's standby counsel to represent him at the upcoming jury trial. The jury found Love guilty as charged. Love now appeals.

## Discussion & Decision

[30] A defendant in a criminal case has a constitutional right under the Sixth Amendment to proceed without the assistance of counsel. *Faretta v. California*, 422 U.S. 806, 821 (1975) (holding that "[t]he Sixth Amendment . . . implies a right of self-representation"). This right may be overridden if a defendant is not "able and willing to abide by rules of procedure and courtroom protocol." *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). The trial court is in the best position to assess whether a defendant has the ability and willingness to proceed pro se. *See Edwards v. State*, 902 N.E.2d 821, 824 (Ind. 2009); *Poynter v. State*, 749 N.E.2d 1122, 1128 (Ind. 2001).

[31] Love argues that the trial court committed reversible error by terminating his self-representation on the basis of his physical condition. There being no Indiana case that has addressed under what circumstances a defendant's physical condition or impairment may preclude self-representation, Love directs us to cases from other States.

[32] In *Savage v. Estelle*, 924 F.2d 1459, 1464 (9th Cir. 1990), the circuit court held that the trial court's denial of the defendant's pro se request was proper because he had a severe speech impediment (i.e., extreme stutter) that made him "physically incapable of presenting his case to the jury." Two years later, in *People v. Watkins*, 6 Cal. App. 4th 595, 600 (Cal. Ct. App. 1992), the court, citing *Savage*, similarly held that substantial evidence supported the trial court's finding that the defendant's speech impediment was so severe that he was

unable to communicate with the judge and jury, and thus, the trial court properly denied the defendant's motion for self-representation.

[33] In *State v. Doss*, 568 P.2d 1054, 1058 (Ariz. 1977), the Arizona Supreme Court held that the trial court properly determined that the defendant was physically unable to carry on his defense, where even the defendant acknowledged that stress affected his speech and presented a danger of a seizure. In *Pickens v. State*, 292 N.W.2d 601, 611 (Wis. 1980) (*overruled on other grounds by State v. Klessig*, 564 N.W.2d 716 (Wis. 1997)), the Wisconsin Supreme Court identified factors to consider in determining whether a defendant is capable of conducting his own defense, including the defendant's education, literacy, fluency in English, and any *physical* or psychological disability that could "significantly influence his ability to communicate a possible defense to the jury."

[34] Love asserts that these cases "stand for the proposition that a trial court may revoke a defendant's pro se status when a physical limitation makes it impossible for the defendant to effectively communicate and conduct a defense." *Appellant's Brief* at 23. Love maintains that, despite the pain he was experiencing and his overall medical condition, he remained at all times able to effectively communicate and conduct his defense. He also asserts that his physical distress did not make him unwilling or unable to abide by the rules of procedure and courtroom protocol.

[35] The State asserts an interest in maintaining the integrity of the trial process and the orderly administration of justice. Indeed, the United States Supreme Court

has noted that "the right of self-representation is not a license to abuse the dignity of the courtroom." *Faretta*, 422 U.S. at 835 n. 46. The Indiana Supreme Court has likewise found that part and parcel of a defendant's right to represent himself is "the state's interest in preserving the orderly processes of criminal justice and courtroom decorum." *Russell v. State*, 383 N.E.2d 309, 312 (Ind. 1978) (citing *Illinois v. Allen*, 397 U.S. 337 (1970); *German v. State*, 373 N.E.2d 880 (Ind. 1978)). In other words, a trial court may terminate self-representation by a defendant who deliberately engages in serious or obstructionist misconduct, *German*, 373 N.E.2d 880, or where the record shows that the defendant was abusing his pro se status as a means to engage in dilatory tactics or to distort the conduct of the trial. *State v. Whalen*, 961 P.2d 1051, 1058 (Ariz. Ct. App. 1997). In this vein, the State argues that Love was denied his right to self-representation because he used the fact of his self-representation and his pain and suffering due to his medical conditions to manipulate the court and delay the proceedings. Specifically, the State argues that since Love took over his case, he used his medical condition and self-representation (1) to seek appointment of new counsel more to his liking, (2) to obtain continual delays of his trial, (3) as a basis for requests for his release from jail, and (4) to be able to display his infirmities to the jury.

[36] In denying a defendant his right to self-representation, care should be taken to "ensure that the record reflect respect for all of defendant's rights" and, "to the extent possible, prevent the manipulative defendant from fashioning a record which seems to reflect an unconstitutional denial" of the right to counsel/self-

representation. *See Russell*, 383 N.E.2d at 312. We do not find this to require that a trial court conduct a special inquiry, but nevertheless note that making a record to support the decision to terminate a defendant's self-representation would be beneficial for appellate review. We will review and consider the entire record to make sure the defendant's right to self-representation has not been violated.

[37] Here, in terminating Love's self-representation, the trial court explained on the record: "I think you are not physically in a condition to represent yourself and I am now appointing [standby counsel] to take over." *Transcript Vol. II* at 73. The trial court reaffirmed its position, stating on the record a second time: "[j]ust make sure the minutes show the Court finds the Defendant['s] behavior is so that he is unable to effectively represent himself." *Id*. at 74. Love argues that the trial court could not deny him his right to self-representation based solely on his physical condition where such did not impact his ability to communicate. Having reviewed the record, we find that the totality of the circumstances provides more context for the court's statement and indicates that the trial court considered more than the mere fact of Love's medical condition in terminating his pro se status.

[38] In requesting to proceed pro se, Love indicated that he was not satisfied with his public defender because his representation was "not adequate," accusing his public defender of misconduct and sabotaging his defense. *Supplemental Transcript* at 31. After the trial court granted his request to proceed pro se, Love asked the court for an assistant and/or co-counsel as well as an investigator.

He also requested a continuance of the upcoming jury trial and agreed to a March trial date. In requesting a continuance of the March trial date, Love placed blame on his public defender (now standby counsel) and the State for his inability to be prepared for trial.

[39] Prior to the May trial date, Love again requested co-counsel and an investigator due to the volume of the State's evidence. Love also claimed that he needed another continuance of his trial because of the "excruciating pain" he was in as a result of his medical conditions, including a hernia which he claimed had just "popped up . . . last night." *Transcript Vol. II* at 5. In truth, Love had suffered with hernias since long before the day of that hearing.

[40] Love's pleading with the court and Judge Carlisle's recusal gained Love a continuance of his jury trial to August 7, 2017. Love requested and received a continuance of the August trial date, only to ask that the date be reinstated four days prior to the originally scheduled date. Love claimed his medical conditions and the fact that he was suffering from headaches made him unaware of what he was doing when he requested the continuance. The trial court denied Love's request.

[41] On August 16, 2017, the trial court held a hearing on the State's motion to continue the September trial date. Love objected to a continuance, claiming he wanted to get the trial over with because he needed urgent medical care outside of the jail. When the trial court indicated it was denying the State's request to continue, Love complained of insufficient access to the law library and noted

his need for medical treatment. It was during this hearing that Love exposed his stomach to the trial court to display his hernia, while explaining to the court that he had diagnosed himself with a strangulated hernia.

[42] When the trial court informed Love that it needed to continue the September trial date due to a scheduling conflict, Love requested that he be immediately released so he could obtain dental care and medical care of his choosing. The trial court encouraged Love to accept the treatment offered by the jail and to try to get healthy prior to trial. The trial court explained to Love that display of his medical conditions to jurors could result in a mistrial or termination of his pro se status. Love indicated that he understood, but then asked the court if he could lie down while presenting his defense, explaining that he needed to move around and lie down on account of his medical condition. The trial court informed Love that he would not be permitted to display his medical condition in such way but offered to accommodate him by taking frequent breaks during the trial.

[43] About two weeks before the October trial date, Love filed a motion alleging indifference to his medical condition by the jail and setting out a plethora of severe and even life-threatening medical conditions. At the next hearing, the trial court confronted Love with information the court had received indicating that Love had been transferred to the hospital at least eighteen times, but that he had refused medical treatment each time. Love admitted to the court that he would not consent to certain medical care while he was in jail. Love again raised the issue of his need to lie on the floor and claimed that it was unfair to

not allow him to do so while he was presenting his defense. When the trial court reminded Love that standby counsel could take over his case if he was unable to continue under such circumstances, Love accused his standby counsel of being a "saboteur[]" and demanded appointment of a private attorney. *Transcript Vol. II* at 29. The trial court informed Love that the trial would not be continued and then, to create a back-up plan, the trial court asked standby counsel when he could be ready to try the case in the event Love was unable to represent himself. Standby counsel indicated that he would be prepared by the end of October. Love then began to grimace, audibly moan, and displayed his catheter bag in such a way that the trial court noted his conduct on the record.

[44] By the time of the final motions hearing on October 27, 2017, Love had not filed any pretrial motions and had not asked to subpoena any witnesses or documents that he needed for his defense. Love also refused to make any oral motions despite the court's invitation, claiming he would not do so because the trial court interrupted him when he spoke. Love pleaded with the court to continue the trial because he needed more evidence and he needed to subpoena his witnesses. He also claimed that he had not had sufficient time in the law library, despite the fact that the court had previously granted his request for additional time several weeks prior to the trial. Love also claimed he was being discriminated against because he was not provided with appropriate grooming tools to shave, comb his hair, and otherwise get presentable for trial.

[45] After the trial court denied all of Love's motions and began explaining the process of voir dire, Love began wincing in pain and displaying signs of

physical distress. The court told Love that although he was ambulatory, he could be seated in his wheelchair and wear appropriate clothing. The court admonished Love not to mention his health condition or display distress during the trial, noting the possibility that his standby counsel would be directed to take over his defense. Love continued displaying signs of "agony" and accused the trial court of discriminating against his "disability." *Id*. at 72. Love then began "waiving his urine bag in the air around his wheelchair, winching [sic] and grasping at his belly, grasping and bending and groaning audibly." *Id*. at 73. When the trial court warned him that he could not make such displays in front of the jury, Love replied, "My pain is for real." *Id*. At this point, the court terminated Love's self-representation and substituted standby counsel as Love's attorney.

[46] Having reviewed the record, we find Love's actions speak louder than his words. Although claiming that he wanted to proceed with the trial, Love repeatedly used the fact of his self-representation and his medical conditions as reasons to seek continuances. Contrary to his claimed desire to represent himself, Love requested that he be appointed co-counsel and even demanded a private attorney. Love also refused medical treatment for serious and life-threatening conditions and then, on account of such conditions, requested release from jail so he could obtain medical treatment of his choosing. In several motions, Love indicated that his physical conditions were such that he was unable to communicate with his attorney. On another occasion, Love explained that his medical condition caused him to seek a continuance of his

jury trial because he was not in his right state of mind. He also used his medical conditions as his reason for not being able to prepare for trial in a timely manner. Although Love managed to represent himself by filing various motions and presenting argument to the court, most of his pleadings largely consisted of delaying his trial date, seeking co-counsel and an investigator by complaining about the disadvantages of self-representation. During hearings before the court, Love would resort to making accusations of discriminatory treatment by the court, his public defender, and the jail if things did not go his way. Days before his trial was set to begin, Love was in the courtroom wincing in pain, grasping at his belly, and groaning.

[47] We reject Love's assertion that the trial court should have waited to terminate his self-representation until after it had an opportunity to reevaluate his medical condition on the day of trial. We also do not find that the trial court was required under these circumstances to permit Love to proceed pro se until such time during the trial that he may have become physically unable to carry on his defense. As set out above, the totality of the circumstances demonstrate that Love was not willing to move forward with the proceedings against him in a timely manner and that he was not willing to abide by courtroom procedures and decorum. The trial court was patient and accommodating throughout the proceedings, but the continuous delays occasioned by Love for a variety of reasons served only to delay the administration of justice. Under the circumstances, we cannot say that the trial court was wrong to terminate Love's self-representation.

Judgment affirmed.

Robb, J. and Pyle, J., concur.